THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL TAYLOR *et al.*, Defendants (Jennifer Yeast, Defendant-Appellant).

Fourth District   No. 4—89—0498

Opinion filed June 27, 1990.—Rehearing denied August 15, 1990.

James C. Craven, of James C. Craven, P.C., Gregory Collins, of Stratton, Dobbs, Nardulli & Lestikow, and Donald M. Craven, of Donald M. Craven, P.C., all of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and David E. Mannchen, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STOUDER delivered the opinion of the court:

This case arises from the murder of Raymond A. Boldin on June 16, 1988. A three-count indictment filed on July 7, 1988, charged the defendant, Jennifer Gay Yeast, along with Michael Taylor, John Brazelton and Vernon Brazle, with the murder of Boldin. On November 9, 1988, Brazelton pled guilty to the murder of Boldin. On November 14, 1988, Brazle had his murder charge dismissed in exchange for immunity. Following a jury trial in April 1989, the defendant was convicted of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)) on an accountability theory. The defendant's post-trial motions were denied, and the trial court sentenced the defendant to a 30-year term of imprisonment. The defendant appeals her conviction and sentence.

The record reveals the following information. The defendant was an assistant manager at a Burger King restaurant in Rantoul, Illinois. She attended a Burger King Corporation training class in Downers Grove, Illinois, on April 18 through 22, 1988. During the course of this week-long class, the defendant met the victim. Boldin was the manager of a Burger King Restaurant in Oak Forest, Illinois. Boldin had recently separated from his wife and was residing with his parents in Orland Hills, Illinois. The defendant and Boldin became romantically involved and began a long-distance relationship, with the defendant frequently travelling to Orland Hills to visit Boldin and Boldin travelling to Champaign, Illinois, to visit the defendant.

During the months of April and May 1988, the defendant resided at 1214 Mimosa in Champaign. This was not the defendant's residence, but the residence of Michael Taylor. According to the defendant, she and Taylor, with whom she had previously been romantically involved, were involved in a platonic relationship during this time. The defendant indicated that she had experienced difficulties with her roommate and that she moved in with Taylor until her roommate moved out. At trial, however, Brazelton indicated that during this time the defendant and Taylor had a "boyfriend-girlfriend" relationship.

The long-distance relationship with Boldin also continued. The defendant and Boldin had discussed the possibility of the defendant leaving the Champaign area and transferring to a Burger King restaurant in the Chicago area. The defendant had asked for such a transfer, requesting that it take place in August 1988. Additionally, the two had discussed living together once the defendant moved to the Chicago area.

It is not clear from the record how the plan that resulted in Boldin's murder came about. John Brazelton testified that on June 13, 1988, Taylor told him that he was upset that the defendant was in-

volved in another relationship. Taylor indicated that he would just as soon confront Boldin and beat him up rather than have to look at him. Brazelton testified that the next day, June 14, 1988, he and Taylor drove to a remote borrow pit north of Champaign and formulated a plan whereby the defendant would bring Boldin to the borrow pit and Taylor would rough him up and leave him to walk back to town. Apparently the goal of the plan was to scare Boldin from further contact with the defendant. Brazelton's role was to watch the fight and intervene if Boldin started getting the better of Taylor.

Brazelton further testified that on the night of June 14, 1988, Taylor, Brazelton and the defendant went to the borrow pit in the defendant's car. Taylor indicated to the defendant where he and Brazelton would be hiding and where she should stop the car so that he could ambush Boldin.

The night of June 15, 1988, the defendant was working at the Burger King restaurant. She contacted Boldin and indicated that she was being verbally harassed by two male employees. She requested that he drive down from Orland Hills and assist her with the two employees. Boldin agreed, indicating that he would arrive in the Champaign area at approximately 10:30 p.m. The defendant contacted Taylor at his residence to advise him that Boldin was on his way to the Champaign area.

Brazle drove Taylor and Brazelton to the borrow pit. The three unloaded a boat from the top of the car, a rope and some concrete blocks. Brazle was instructed to return to Taylor's residence and wait there for the defendant. After her arrival, he was to wait one half hour and return to the borrow pit to pick up Taylor and Brazelton. Brazle then left the area.

Meanwhile, Boldin had arrived at the restaurant. He and the defendant finished some paperwork and then left the restaurant. Boldin, in his car, followed the defendant, in her car, to her apartment on White Street in Champaign. They parked their cars and took some of Boldin's belongings into the apartment. The defendant and Boldin then left the apartment in the defendant's car. The defendant drove the car to the borrow pit.

Upon arriving at the borrow pit, the defendant stopped her car at the prearranged spot where Taylor and Brazelton were waiting. Boldin exited the car and, appearing to be angry, started walking toward the main road. The defendant looked at Taylor and shrugged her shoulders as if to indicate "What do I do now?" Taylor responded: "Bring him back here."

The defendant went to Boldin and talked with him for a few min-

utes. Meanwhile, Taylor crawled on his hands and knees to the passenger side of the defendant's car, locked the door, quietly shut it and crawled back to where he had been hiding.

The defendant and Boldin walked back to the car. The defendant got into the driver's side while Boldin approached the passenger side. As Boldin attempted to open the passenger door, Taylor jumped up from behind Boldin and struck Boldin in the back of the head with his fist a couple of times. The two men struggled, and Taylor threw Boldin to the ground. Boldin started to get up, and Taylor picked up a weight-lifting bar out of the weeds and struck Boldin in the head. Taylor continued to strike Boldin in the head with the bar. During the course of the attack, the defendant drove away, returning to the house at 1214 Mimosa.

Upon arriving at 1214 Mimosa, Brazle and Donald Frye testified that the defendant was upset and crying. She went directly to Taylor's bedroom and, upon questioning by Brazle and Frye, indicated that she had seen Boldin hit once and that it happened like it was supposed to happen.

After Taylor stopped striking Boldin with the bar, either he or Brazelton cut Boldin's throat. The two carried the body to a pond. While Taylor stripped the body of clothes, Brazelton retrieved the concrete blocks from the drop off point, and the two men attached the blocks to the body using rope. The two men loaded the body into the boat, but the boat overturned in relatively shallow water and the body sank to the bottom. The two men returned to the shore, hid the boat, cleaned up the murder scene and threw the weight-lifting bar into the pond. Shortly thereafter, Brazle returned and picked them up. Brazle, Brazelton, and Taylor returned to 1214 Mimosa.

The defendant, Brazelton, Taylor and Frye then proceeded to the defendant's apartment on White Street in Champaign. The four retrieved some of the victim's personal articles from the apartment. The group then divided, with Taylor and Brazelton getting into the victim's car and Frye and the defendant getting into the defendant's car. The two cars travelled together to a rural area where Taylor and Brazelton disposed of the victim's car in a ravine. The four additionally disposed of the victim's personal effects and then returned to the 1214 Mimosa residence.

Boldin's car was discovered by the police on June 16, 1988. Boldin's body was discovered on June 20, 1988. An autopsy performed on the body confirmed the identity of the body, with the pathologist opining that death had occurred as a result of severe head injury due to multiple skull fractures resulting from a narrow, blunt-edge trauma.

The pathologist further testified that death probably occurred late on June 15 or on June 16, 1988.

During the course of the investigation into Boldin's murder, the defendant made three statements to the police. The first was made on June 21, 1988. In that statement the defendant indicated that after Boldin arrived in Champaign on June 15, 1988, the two got into an argument because the defendant wanted to cool off the relationship. Boldin left and, because she was upset, the defendant went to Taylor's residence. While there, Brazelton and Taylor left, and when they came back they told her that she wouldn't be bothered by Boldin anymore.

The second statement was made on June 22, 1988, six to eight hours after the first statement. At that time the defendant indicated that she and Boldin were having a fight at her apartment because she wasn't sure that she wanted to live with him. Taylor's name came up during the fight and Boldin, upset, left the apartment. The defendant went to Taylor's house, and shortly thereafter Boldin arrived. She said that Brazelton hit Boldin with something in his hands because Boldin was going to hit Taylor. She saw Boldin fall and went back into the house.

The defendant's third statement was made on June 28, 1988, after she had been arrested for Boldin's murder. The defendant explained that her statement on June 22, 1988, was made out of fear of reprisal by Brazelton and Taylor. However, since both men had been arrested, she had nothing to fear and wanted to correct her story.

In her third statement the defendant indicated that she drove Boldin out to the borrow pit, where the two sat in her car and argued. During the course of the argument, Boldin exited the car and started walking up the hill. She got out of the car and caught up with him. The two talked for several minutes and then returned to the car. When they arrived at the car, she got in while Boldin waited outside, waiting for her to unlock the passenger door. At that moment Brazelton and Taylor jumped out and struck Boldin in the head. Boldin screamed and she screamed. She then realized that her car keys were not in the car. Taylor came around and handed her the keys, instructing her to drive back to his residence on Mimosa. Boldin was hit again and screamed in pain. She screamed and drove away crying. The remainder of her statement concerning the disposal of Boldin's car corresponds to participants Brazelton's and Frye's versions.

When specifically asked during the third statement about whether there was a plan conceived by Taylor, Brazelton and her, the defendant replied: "They told me to bring Ray to the pond. Other than that, I didn't know what they had planned. I, the only plan that I thought of

was that they were going to scare him, fight with him, but I did not know, I did not believe that they would kill him." Next, she was asked whether it was safe to say that she thought they were going to beat him up and teach him a lesson. The defendant replied: "I don't know if they had planned to beat him up, if they wanted to talk to him, wanted to get him away from people, I'm not knowledgeable."

At trial the defendant testified that Taylor had asked her on June 15, 1988, whether Boldin would be coming to Champaign that day. Taylor asked her to bring Boldin to the borrow pit. She indicated that maybe she would bring Boldin to the borrow pit, that they would have to wait and see. She testified that she did not know for a fact that Taylor would be at the borrow pit and that Taylor never said anything about Brazelton being there. Her intentions, when walking back to the car that night with Boldin, were to get in the car with him and drive back to her apartment. She testified that she didn't know Boldin was dead until June 21, 1988, and that neither Taylor nor Brazelton actually told her what happened after she left the pit that night.

As previously indicated, the defendant was found guilty of first degree murder and now appeals, raising several issues for our consideration.

The defendant's first issue contends that the accountability instruction was improper because it misstated the law and allowed the jury to convict her without reaching a unanimous verdict.

■ Section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c)) defines accountability. It provides:

> "A person is legally accountable for the conduct of another when:
>
> * * *
>
> (c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

People's instruction No. 10 was given over the objection of the defendant. This instruction, a modified version of Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. Supp. 1987) states:

> "A person is responsible for the conduct of another when, either before or during the commission of an offense, with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aides, abets, agrees or attempts to aid the other person in the planning or commission of an offense."

During the prosecutor's closing argument, she read this instruction

to the jury and then argued:

> "Now let me read that again in the context of this case. A person, Jennifer Yeast, the defendant, is responsible for the conduct of another, Michael Taylor, John Brazelton, when either before or during the commission of an offense, which is murder in our case, and with the intent to promote or facilitate the commission of an offense—and an offense does not have to be the same offense as murder—
>
> DEFENSE COUNSEL: Objection to that, your Honor, it's not the instruction.
>
> THE COURT: You may argue.
>
> Thank you your Honor. It does not have to be the same offense. It could be a battery, it could be a disorderly conduct, intimidation, it could be an assault, it could be any offense, so with the intent to promote or facilitate an offense, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of an offense. And that offense could be a battery, a disorderly conduct, an assault, an intimidation, any of those. So in the particular facts of this case, we need to ask, did she knowingly solicit, aid, abet, agree or attempt to aid Mike Taylor and John Brazelton in the commission of an offense?"

The defendant contends that the instruction, coupled with the prosecutor's closing argument, misstated the law and invited the jury to convict the defendant of murder without unanimous agreement on what offense she had the intent to promote or facilitate.

■ The instruction given in this case is substantially similar to the instruction given in *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.[1] In *Terry* our supreme court held that such an instruction accurately states the law on accountability. The law on accountability incorporates the "common design rule," which provides that where two or more persons engage in a common criminal design, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are accountable for those acts. *People v. Fyke* (1989), 190 Ill. App. 3d 713, 720, 546 N.E.2d 1101, citing *People v. Terry* (1984), 99 Ill. 2d 508, 514, 460 N.E.2d 746, 749.

---

[1]The instruction in *Terry* read:

> "A person is responsible for the conduct of another when, either before or during the commission of a crime, and with the intent to promote or facilitate the commission of a crime, he knowingly solicits, aids, abets, agrees or attempts to aid the other person in the planning or commission of a crime." *Terry*, 99 Ill. 2d at 512.

In *People v. Miscichowski* (1986), 143 Ill. App. 3d 646, 655, 493 N.E.2d 135, the appellate court stated:

"In *Terry*, the court held that under section 5—2(c), which incorporated the long established 'common-design rule' [citation], the State need only prove that the defendant had the specific intent to promote or facilitate *a* crime, and not the actual crime for which he was charged. Once the State proved that the defendant intended to promote or facilitate *a* crime, he was responsible for *any* criminal act done in furtherance of the intended crime. Thus, where the defendant intended to promote or facilitate only a battery, he was legally responsible for the act of his codefendant in stabbing and killing the victim. The defendant did not have to intend that the victim be killed." (Emphasis in original.)

See also *People v. Terry* (1984), 99 Ill. 2d 508, 512, 460 N.E.2d 746.

The defendant contends that the State failed to establish a specific crime which was the "common design" of the group. We note, however, that the defendant objected to the instruction offered by the State defining battery. Had the battery instruction been given and the jury returned a guilty verdict as to that offense, there would have been no issue as to whether the defendant could be found guilty of murder on an accountability theory. The defendant, having objected to the State's proffered battery instruction, cannot now claim that the State failed to establish a specific crime which was the common design of the group.

We agree with the State that the jury instruction properly states the law on accountability. Furthermore, we find that ample evidence supports the jury's verdict. It is apparent that the jury believed that the defendant was involved in the plan that led to the victim's murder. Although it is not clear whether the defendant intended for Taylor and Brazelton to kill Boldin, it is clear that she played an integral part in the plan by delivering him to the perpetrators knowing that some harm would come to him. This, we believe, is all that is necessary for making her legally responsible for the acts of Taylor and Brazelton.

The defendant also contends that the trial court committed reversible error by allowing the prosecutor to read the accountability instruction to the jury. A review of the record reveals that the defense counsel also read the accountability instruction to the jury and made his argument.

It is permissible for a prosecutor to frame his argument

around anticipated instructions. (*People v. Grayson* (1980), 89 Ill. App. 3d 766, 773, 411 N.E.2d 1316.) The judge did instruct the jury as to the law, and since both the prosecutor and defense counsel had an opportunity to read the instructions and make their arguments, we do not believe that this constituted reversible error.

The defendant next contends that the murder instruction requires reversal because it created an impermissible presumption regarding the defendant's mental state and shifted the burden of proof on that element of the crime from the prosecution. We disagree.

People's instruction No. 13 states:

"To sustain the charge of first degree murder, the State must prove the following propositions:

*First*: That the defendant or one whose conduct she is legally responsible [for] performed the acts which caused the death of Raymond A. Boldin; and

*Second*: That when the one for whose conduct the defendant is legally responsible did so,

1) he intended to kill or do great bodily harm to Raymond A. Boldin;

or

2) he knew that his acts would cause death or great bodily harm to Raymond A. Boldin;

or

3) he knew that his acts created a strong probability of death or great bodily harm to Raymond A. Boldin;

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

The defendant maintains that by deleting any reference to the female defendant from the second section of the instruction, the State created an impermissible presumption that the state of mind of the defendant was the same as that of her codefendants.

■ We are of the opinion that the instruction accurately states the law on accountability; that is, the defendant can be found guilty of murder when she is legally responsible for the conduct of another *even if* she did not have the intent to kill. We find no impermissible presumption and believe that the instruction was proper.

The defendant next argues that she was deprived of a fair trial by the prosecutor's use of a felony murder analogy during the closing ar-

gument. We disagree.

■ The record reveals that during closing argument the defense counsel used two hypothetical situations concerning accountability situations. The prosecutor then presented a third situation—where a crime other than the one originally contemplated is committed and a homicide results. The defendant cannot complain of error which was invited or provoked by her attorney's conduct. See *People v. Myers* (1966), 35 Ill. 2d 311, 220 N.E.2d 297; *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328; *People v. Webster* (1988), 175 Ill. App. 3d 119, 529 N.E.2d 741.

The defendant next argues that the court erroneously admitted the statements of the defendant's coconspirators. We disagree.

■ Under the coconspirator's exception to the hearsay rule, acts and declarations of coconspirators made in furtherance of a conspiracy are admissible against the defendant even when made out of the defendant's presence, so long as a *prima facie* case of conspiracy has been shown by independent evidence. (*People v. Goodman* (1980), 81 Ill. 2d 278, 283, 408 N.E.2d 215.) The existence of an agreement or conspiracy may be inferred from both direct and circumstantial evidence, including acts and statements of the defendant. *People v. White* (1984), 122 Ill. App. 3d 24, 38, 460 N.E.2d 802.

■ After a careful review of the record, we are of the opinion that there existed overwhelming independent evidence to support the existence of a conspiracy. The discussions between Taylor, Brazelton and Brazle were therefore properly admitted under this exception.

The defendant lastly contends that the trial court erred in the sentencing hearing by refusing to consider all relevant factors in mitigation of the sentence.

■ A trial judge's decision on sentencing is entitled to great weight and deference and should not be disturbed on review absent a showing of abuse of discretion. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 493, 431 N.E.2d 344.) We find no merit in the defendant's contention as to this issue. Accordingly, we affirm the trial court on the imposed sentence of 30 years' imprisonment.

For the reasons listed above, the decision of the circuit court of Champaign County is affirmed.

Affirmed.

BARRY and SCOTT, JJ., concur.