THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
NATHAN RUTHERFORD *et al.*, Defendants-Appellants.

First District (1st Division)   Nos. 1—92—3729, 1—93—0676 cons.

Opinion filed June 26, 1995.—Rehearing denied August 18, 1995.

Antonia S. Pritchard and Shari L. Friedman, both of Keck, Mahin & Cate, of Chicago, for appellant Nathan Rutherford.

Joan Marsh, of Kirkland & Ellis, of Chicago, for appellant Clyde Rutherford.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Peter D. Fischer, Ross M. Eagle, and Michael Golden, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Accepting an invitation to stay at the Rutherfords can prove fatal.

In late March 1991, 19-year-old Stanley Brown (Stan) and 16-year-old Steven Stahler (Stahler) were living in the Rutherford home at 4516 N. Christiana in Chicago. It was not unusual for 16-year-old Nathan Rutherford (Nathan) to invite friends to stay there at times. Nathan lived in the house with his mother and his father, Clyde Rutherford (Clyde).

In early May, Stan's mother filed a missing persons report on her son. A police investigation began. Police officers interviewed Stan's family and friends.

On June 2, 1991, police officers, with the aid of shovels and a backhoe, found Stan's corpse, buried in Hidden Hill in Schiller Woods. He had been beaten and then buried alive. His hands were bound in front of him with a nylon rope.

Clyde, Nathan, and Stahler were charged with Stan's murder and with concealment of his homicidal death.

Clyde was tried in February 1992. That trial ended in a hung jury. He was retried in January 1993, found guilty of both charges by a jury, and sentenced to 27 years' imprisonment.

Nathan was tried in April 1992, found guilty of both charges by a jury, and sentenced to 42 years.

Stahler pleaded guilty to the charges and was sentenced to 45 years.

We have consolidated the appeals of Clyde and Nathan.

We affirm their convictions.

EVIDENCE PRESENTED AT CLYDE'S TRIAL

The State presented Stan's mother, Pat Stille, as a life and death witness. The State also presented Rosalee Augustyn and Donna Dumelle, both sponsors of an Alateen group that Stan attended. These witnesses established that Stan failed to attend a group session scheduled for April 2, 1991, and that the contact phone number he gave at the last session he attended was the Rutherfords' phone number.

The next witness was Steve Williams, owner of the Forest News Agency, which employed Clyde Rutherford. Williams established that Clyde was 1 of 15 employees who provided home delivery of the Sun-Times newspaper. Clyde's route encompassed the area from Belmont to Irving Park Road and from Harlem Avenue to Okedo and could be completed in $1^1/2$ to 2 hours.

Papers were generally picked up around 1 a.m. each day and Clyde typically was the first person waiting in line to pick up papers. Also, Clyde was often accompanied by his son, Nathan, and some of Nathan's friends, when working the paper route.

The next witness was Lori Kellas, a past girl friend of Nathan's. She had known Nathan for about $1^1/2$ years before March 1991. She met both Stahler and Stan in February 1991.

On the weekend of Lori's birthday, in March 1991, Clyde drove Nathan and Stan to Wisconsin to pick her up and drive her to Chicago. The next time Clyde drove Nathan to Wisconsin, on the weekend of April 18, 1991, Stan was not with them. Stahler was. When Clyde pulled up to her house, she walked out of her home to greet them. As she stood 10 to 15 feet from the truck, with Clyde's window open, Nathan presented her with a baseball bat, saying: "Stan's there." He then said that the brownish stains on the bat were Stan's blood.

On the following weekend, Clyde drove Nathan and Stahler to Wisconsin once again to pick up Lori and drive her back to Chicago. Lori stayed in Nathan's room and noticed a brown-colored glass cognac bottle on top of Nathan's television set. The bottle contained a brownish liquid and Nathan told Lori that the liquid was Stan's blood.

On Mother's Day weekend in May 1991, Lori saw Nathan again. When Clyde drove Nathan over to Lori's house to pick her up, Stahler

and a girl named Barbara Campbell were already in the truck. They went to Nathan's grandmother's home in Salem, Wisconsin, and picked up Nathan's mother. As they were driving away from the grandmother's home, Nathan and Stahler started waving and hollering, "Bye, Stan." When Lori asked what they were doing, Nathan told her, "Stan's there," pointing to a swamp near the grandmother's home.

In Chicago, when Lori accompanied Nathan, Stahler, and Clyde on the paper route, she asked Clyde where Stan was. Clyde replied, "He's not here now. I really didn't care for him anyway."

On May 15, 1991, Lori told her friend, Lori Dunbar, about the bat and Nathan's comments. They decided to call the sheriff's office. The Kenosha County sheriff met with Lori. Lori turned over the bat to the sheriff's office.

Detective Larry LaPointe of the Kenosha County sheriff's office testified that the bat recovered from Lori Kellas was analyzed at their crime lab. Tests showed that the bat was stained with human blood. Based on Lori's information, the swamp areas near Nathan's grandmother's home were searched. A brown bottle containing a brownish liquid was recovered. The liquid in the bottle was later determined to be approximately three ounces of human blood.

LaPointe also testified that between May 20 and June 2, 1991, he was in contact with Detectives Mohan and Santopadre of the Chicago police department regarding the disappearance of Stan. On June 2, 1991, he was contacted by the Chicago police and told that Stan's body had been recovered.

Next, Dr. Stein, chief medical examiner for Cook County, testified that he was present on June 2, 1991, when a body was recovered from a makeshift grave located at Hidden Hill in the Schiller Woods Forest Preserve. The body was later positively identified through dental records as that of Stanley Brown. On June 3, 1991, an autopsy was performed on Stan's extremely decomposed body. It revealed that, although there was evidence of lacerations on both sides of Stan's head, there was no skull fracture. Stan died of asphyxiation. There was dirt and gravel in his mouth, esophagus, trachea, and lungs. He had been buried alive. It was also noted that Stan's hands had been bound with rope.

Detective Mohan of the Chicago police department testified that on June 1, 1991, at about 8 p.m., he and his partner went to 4516 N. Christiana, where they arrested Clyde, Nathan, and Stahler. They were transported to Area 5 and interviewed regarding the whereabouts of Stanley Brown. Around 12 p.m. Mohan's partner, Detective Santopadre, took Stahler to Hidden Hill. An excavation of an area at

Hidden Hill was begun. Using a backhoe it took 1 1/2 hours to uncover Stan's body.

Clyde refused to give a signed statement but made oral statements to the police. He first said that he hadn't seen Stan for about two months. Around 10 p.m. on June 1, 1991, Detective Mohan had a second conversation with Clyde regarding the events leading to Stan's death. Clyde said that on April 1, 1991, he saw Stan coming down the stairs of his home, assisted by Nathan and Stahler. He knew that Stan had been beaten and could see that he was bleeding. Nathan and Stahler asked him for a ride to Schiller Woods. He agreed to take them and directed them to put Stan in the back of the truck. At Schiller Woods, Stahler and Stan walked off towards the woods. Stahler had a shovel and a car battery. Clyde stated that it was his understanding that Stahler intended to beat Stan some more in the woods. He and Nathan then left to do the paper route.

Stahler met up with them on the paper route sometime later, without Stan. Clyde stated that he asked where his shovel was. Then they drove to where Stahler left the shovel to recover it. Clyde said he asked Stahler about Stan. Stahler told him that Stan got scared and ran off.

Detective Mark Sanders testified that on June 2, 1991, he executed a search warrant on Clyde's residence and truck. Clyde had voluntarily consented to the search and accompanied Sanders to the residence for the search.

In the course of the search, pictures were taken of Clyde's truck. They recovered items from the back of the truck, including pieces of rope (similar to that used to bind Stan's hands), a shovel, a wooden handle, and a gray jacket.

Inside the house the search was confined to the upstairs, where Nathan's bedroom was located. Several photos were taken. Some photos showed the three beds in Nathan's room and the television set where Lori Kellas testified that the bottle containing Stan's blood had been displayed. Sanders also testified that other items were recovered and inventoried. They included: a piece of plywood and a piece of particle board, both of which were found behind a small bureau at the top of the stairs, both containing brownish stains; a guitar, on which the markings "S.D. 4—2—91" were written in a brownish substance; a metal baseball bat; a wooden bat with nails driven into it; a pair of blue jeans; and a Metallica T-shirt.

Assistant State's Attorney Matthew Mahoney testified that he spoke with Clyde at 11:50 a.m. on June 2, 1991, at Area 5 headquarters. Clyde repeated essentially the same statement that he had given Detective Mohan the night before, with one exception. Clyde said

that he knew that Stan had been beaten due to the fact that he had destroyed a misprinted $5 bill. Clyde refused to provide a signed statement or give his statement before a court reporter.

On cross-examination Mahoney admitted that he obtained a 22-page court-reported statement from Stahler, but did not reveal the substance of that statement.

The last witnesses for the State were John Van Altina and Pamela Fish. Van Altina testified that he had been working at a cemetery for 40 years and was foreman for the last 15 years. At this cemetery they always dig the graves by hand. Van Altina testified that he had gone to Schiller Woods to determine the soil conditions at Hidden Hill and, based upon his observations and experience, he estimated that it would have taken one person at least two hours to dig a grave the same size as the one in which Stan was buried. In addition, it would have taken between 45 minutes and $1^1/2$ hours to refill the hole to cover the grave.

On cross-examination, Van Altina agreed that it would take less time to dig a grave of smaller dimensions. He estimated that a grave the size of 5 feet long, $1^1/2$ feet wide and 3 feet deep would take one person about an hour to dig and 30 to 45 minutes to refill.

Pamela Fish, a criminalist in serology for the Chicago police department, testified that her tests revealed that human blood was present on the plywood board, the baseball bat, and in the brown glass bottle. Also, the phrase "S.D. 4—2—91" was written on the guitar in blood. She was unable to determine the blood type because it had been absorbed by the porous, wooden surfaces, and the blood in the bottle had degraded due to exposure.

The defense recalled, as its only witnesses, Detectives Mohan and Santopadre. Counsel showed Detective Mohan some pictures of the parking lot at Schiller Woods to establish that there are small cement pillars ringing the field to prevent the public from driving out onto the field. Counsel asked Santopadre about his trip to Hidden Hill with Stahler. Santopadre testified that Stahler marked an area on Hidden Hill with his foot. After these witnesses, the defense rested.

## EVIDENCE PRESENTED AT NATHAN'S TRIAL

Shortly after his arrest, Nathan signed a six-page written statement. It set out his role in the events leading up to and following Stan's burial. The evidence presented at Nathan's trial was nearly identical to the evidence at Clyde's trial, except that Nathan's statement was used. Neither Clyde's oral statement nor Stahler's 22-page court-reported statement was offered at Nathan's trial.

In summary, Nathan's statement was: Late in March 1991, Nathan discovered that a misprinted $5 bill he owned, valued at $600, was missing. Nathan learned that Stan had taken the bill and confronted him about it. Stan admitted taking the bill after Nathan kicked Stan in the nose, breaking it, and punched him several times. Stan agreed to return the bill.

Later, Stan showed Nathan the bill he had taken and Nathan realized that the bill had been dyed with ink and that its value was ruined. He became very angry. A day or two later, at the Rutherford home, Stan threw a beer bottle at Nathan as Nathan was entering his bedroom. Nathan took the beer bottle and hit Stan on the side of the head with it, causing a deep cut that bled profusely. Nathan continued to beat Stan with his fists, kick him, and throw objects at him.

Stahler was also present and joined in beating Stan. He used the wooden handle from a toilet plunger. Stahler and Nathan beat Stan for 10 minutes or more. When they finished, Stan was "very out of it." As Stan sat leaning against a wall of Nathan's room, Stahler collected blood from the cut on Stan's head into a bottle. Nathan took a baseball bat and rolled it in Stan's blood as a souvenir of the incident.

After the beating, Stan was "kicked" into the shower and told to wash off. Nathan and Stahler discussed getting rid of Stan. Nathan thought Stan was going to die and didn't want a dead body around the house. They decided that the best alternative was to bury him in the woods. At about 11 p.m., when it was time to leave to deliver papers on Clyde's paper route, Stan was taken downstairs, assisted by both Nathan and Stahler, and placed in the back of Clyde's truck.

Clyde allowed Stan to be placed in his truck and agreed to drive them to Schiller Woods Forest Preserve. At the forest preserve Nathan and Stahler helped Stan out of the truck and sat him on the ground. Stan and Stahler walked off towards the woods with Stahler carrying an ax handle and a shovel. Stan was forced to carry a battery. The battery was taken because Stahler intended to pour battery acid on Stan's body.

Nathan and Clyde drove off to deliver papers. Stahler met up with them along the paper route 1 1/2 hours later. Stahler told Nathan that he buried Stan in Hidden Hill. Clyde drove them to an alley where Stahler had hidden the ax handle and shovel so they could retrieve these items.

Nathan also admitted taking the bloodied bat to Wisconsin and giving it to a girl friend. He took the bottle of blood to Wisconsin, where he threw it in a swamp near his grandmother's house.

In addition to Nathan's statement, the State presented the same

witnesses who testified at Clyde's trial, with the exception of Steve Williams, Clyde's employer, and John Van Altina, the cemetery foreman. (Nancy Jones, an assistant medical examiner, testified in place of Dr. Stein, who was ill.)

The only defense witness was Nathan's mother. She said she had 10 other children and that her other sons, who had lived in the house before March 1991, had contributed to the graffiti on the walls of Nathan's bedroom.

## ISSUES IN CLYDE RUTHERFORD'S CASE

Clyde raises four issues on appeal: (1) whether the trial court erred when it refused to allow him to introduce the post-arrest confessions of Nathan and Stahler; (2) whether Clyde's convictions, based on an accountability theory, are supported by the evidence; (3) whether the prosecutor's comments during closing argument constituted misconduct requiring reversal; and (4) whether the trial court improperly admitted certain items of evidence. We address each issue.

## THE POST-ARREST CONFESSIONS OF NATHAN AND STAHLER

In Clyde's first trial, his lawyer successfully moved to bar admission of his codefendants' statements. The jury hung. On retrial, Clyde's lawyer opposed the State's motion to preclude any reference to those statements. The defense contended at trial, and here, that the statements were admissible hearsay exceptions as statements against penal interest.

The trial court granted the State's motion, mainly because the declarants were not before the court to testify and because the statements were made to police officers.

Generally, a third party's out-of-court statement that he committed a crime is inadmissible hearsay, even though it is a statement against the declarant's penal interest. *People v. Tate* (1981), 87 Ill. 2d 134, 143, 429 N.E.2d 470.

There is an exception to the general rule of inadmissibility: the statements may be admitted "where justice requires." *People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995.

The seminal decision on this issue is *Chambers v. Mississippi* (1973), 410 U.S. 284, 300-01, 35 L. Ed. 2d 297, 311-12, 93 S. Ct. 1038, 1048-49. In *Chambers,* the Court held a defendant was deprived of a fair trial because he was prevented from using a third party's out-of-court statement that exculpated the defendant and inculpated the declarant. The Court listed four factors that supported admissibility:

(1) the statement was made spontaneously to a close acquaintance shortly after the crime occurred; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and against the declarant's interest; and (4) there was adequate opportunity for cross-examination of the declarant.

After *Chambers*, Illinois courts used a mechanistic approach, holding that all four factors, as listed in *Chambers*, had to exist before the out-of-court statement could be admitted.

For example, some cases held statements made to police officers could not qualify as declarations against penal interest under *Chambers*. (See *People v. Bonilla* (1983), 117 Ill. App. 3d 1041, 453 N.E.2d 1322; *People v. Bracey* (1981), 93 Ill. App. 3d 864, 417 N.E.2d 1029.) Others held the statements had to be virtually contemporaneous with the crime to be admissible. See *People v. Tate* (1981), 87 Ill. 2d 134, 429 N.E.2d 470; *People v. Nally* (1985), 134 Ill. App. 3d 865, 480 N.E.2d 1373; *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 480 N.E.2d 1373.

Did *Chambers* really mean each of the four factors had to exist, precisely, before an out-of-court declaration against penal interest could be admitted? Or was the Court simply emphasizing facts that supported a finding of trustworthiness in that case, without establishing any litmus test?

The answer in this State came seven years after *Chambers*, in *People v. Bowel* (1986), 111 Ill. 2d 58, 488 N.E.2d 995. Rejecting the view that each *Chambers* factor is a prerequisite to admission, the court said:

> "The four factors which the court enumerated in *Chambers v. Mississippi* [citation] are to be regarded simply as indicia of trustworthiness and not as requirements of admissibility. The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67.

■ In *Bowel*, the court noted that Federal Rule of Evidence 804 (b)(3) codified the admissibility of a statement made against penal interest. It provides:

> "(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (3) Statement against interest. A statement which *** at the time of its making *** so far tended to subject the declarant to civil or criminal liability ***, that a reasonable person in the

declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." Fed. R. Evid. 804(b)(3).

Rule 804(b)(3) places a premium on a clear indication of trustworthiness, reflecting a distrust of third party confessions that exculpate an accused. It does not refer to the timing, place, or recipient of the statement. Because it requires the declarant to be unavailable, the rule dispenses with *Chambers'* fourth factor—the declarant's presence in court and his availability for cross-examination.

Is Rule 804(b)(3) now the law in Illinois? Maybe. The appellate court thought so in *People v. Rice* (1993), 247 Ill. App. 3d 415, 617 N.E.2d 360. Applying the rule, the court reversed a conviction because the trial judge would not allow into evidence the testimony of a codefendant given under oath at a motion to suppress hearing.

The supreme court agreed to hear the case. But it expressly declined to address the State's argument that Rule 804(b)(3) is not the law in this State. Instead, the court, in a 4-3 decision, held that the suppression hearing testimony would be inadmissible under either *Chambers* or Rule 804(b)(3). *People v. Rice* (1995), 166 Ill. 2d 35.

In *Rice*, the court collapsed *Chambers* and Rule 804(b)(3), selecting parts of each to reach its decision. The court assumed the codefendant's statement was against his penal interest. It also assumed, "for a Rule 804(b)(3) analysis, that codefendant was also unavailable, having asserted his fifth amendment right not to testify." *Rice*, 166 Ill. 2d at 44.

That left for discussion "the requirement under Rule 804(b)(3) and *Chambers* that in order for the statement to be admissible sufficient circumstances exist to demonstrate the trustworthiness of the testimony given by codefendant at the hearing on his motion to suppress." *Rice*, 166 Ill. 2d at 44.

The court then went on to find the testimony was not reliable enough to pass the combined *Chambers*-Rule 804(b)(3) test. Among the court's reasons: the testimony came 22 months after the seizure at issue and the declarant had a motive to lie.

We now examine the facts in this case to determine whether the statements of Nathan and Stahler should have been admitted at Clyde's trial.

■ We have no difficulty saying their statements were against their penal interest. Nathan and, in more grisly detail, Stahler chronicled their roles in Stan's death. Their statements are confessions in every sense of the word.

There are ample indicia of reliability. Or, as Rule 804(b)(3) requires, "corroborating circumstances clearly indicate the trustworthiness of the statement." Other witnesses spoke of the blood in the bottle and the bloody baseball bat, as Nathan and Stahler did. Stahler led the police to the burial ground. Both gave almost identical versions of the beatings, supported by the medical evidence. Neither made an attempt to exculpate Clyde.

The fact that the statements were made some time after the murder is not fatal to admission, since it is the "qualitative content and circumstances" of the statements that matter. See *People v. Cruz* (1994), 162 Ill. 2d 314, 345, 643 N.E.2d 636.

Making the statements to a police officer, rather than the close acquaintance in *Chambers*, enhances, rather than diminishes the reliability of the statements. *Cruz*, 162 Ill. 2d at 344-46; *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1020-21, 501 N.E.2d 207.

The factor that takes the statements in this case out of Rule 804(b)(3) is the threshold requirement: the declarant must be unavailable. Here, there was no showing of unavailability.

The defense made no attempt to bring Nathan or Stahler to the witness stand. The trial judge said he would allow the defense to call them; in fact, he invited the defense to do so.

Had Stahler or Nathan refused to testify, either by asserting a constitutional privilege or simply persisting in refusal in the face of a court order, he would have been "unavailable" within the meaning of Rule 804(b)(3). See Fed. Rules of Evid. 804(a)(1), (a)(2).

Whether the statements would be admissible under a separate *Chambers* analysis, as portrayed in *People v. Rice*, is a question we need not decide. Our reason differs from that of the trial court. We hold it did not abuse its discretion because the statements did nothing to exculpate Clyde. In fact, they contained strong evidence against him.

Clyde, in his statements to the police, admitted that Stan, beaten and bloody, was placed in the back of Clyde's truck by Nathan and Stahler, and that he drove them to a remote woods in the dark of night, knowing at the least that Stan was going to be beaten even more. Clyde also knew Stahler had a shovel and a car battery. Stan did not come back with Stahler and was never seen again, alive.

The codefendants substantiate Clyde's involvement. For example, page 12 of Stahler's statement:

"Q. Did you encounter anyone on the way down the stairs?
A. Nathan's Dad.
Q. Did Nathan's father say anything?
A. Asked what happened.

Q. What did you say?

A. We told him that he come back and he started something with us, and we beat him.

Q. By he, you mean Stan?

A. Yes.

Q. What did Nathan's father say when you said that?

A. He just agreed with it."

This case is much like *People v. Rodriguez* (1993), 254 Ill. App. 3d 921, 627 N.E.2d 209. After concluding the out-of-court statement did not satisfy the *Chambers* requirements, the court said:

"We might take a different view of the matter if the excluded statement exonerated defendant. However, in the present case, Vargas' statement does not exonerate but rather incriminates defendant for the exact offense of which he was convicted, *i.e.*, first degree murder by accountability." *Rodriquez*, 254 Ill. App. 3d at 930.

That is the case here. We do not find the "clear showing of abuse of discretion" that is required for reversal on this evidentiary issue. See *Bowel*, 111 Ill. 2d at 68.

THE WEIGHT OF THE EVIDENCE

Clyde's conviction was based on an accountability theory. His oral statements to the police and to an assistant State's Attorney were corroborated by the physical evidence and the testimony of Lori Kellas.

The reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 478 N.E.2d 402.) A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

Clyde drove a beaten and bloody Stan to a remote area of woods, late at night. He stood by while Stahler, carrying a shovel, took Stan farther into the woods. He knew Stan would be beaten some more. The shovel used to bury Stan came from Clyde's truck. Stan's hands were bound with rope similar to the rope in Clyde's truck. He knew Stan was being punished for his destruction of a misprinted $5 bill.

There is nothing improbable or unsatisfactory about the evidence. It supports the conclusion that Clyde shared a common purpose with Nathan and Stahler. He voluntarily attached himself to a group bent on illegal acts. He did not have to do the actual killing or the actual concealment of the body to be guilty of murder and concealment of a homicidal death. He knew serious harm would

come to Stan and he helped cause that harm. He supplied the burial shovel. That is enough. See *People v. Stanciel* (1992), 153 Ill. 2d 218, 606 N.E.2d 1201; *People v. Moreno* (1992), 238 Ill. App. 3d 626, 606 N.E.2d 514; *People v. Taylor* (1990), 199 Ill. App. 3d 933, 557 N.E.2d 917.

## THE PROSECUTOR'S CLOSING ARGUMENT

Clyde contends the State confused the jury by misstating the law of accountability in final argument. The prosecutor argued:

"Even if you only believe that his involvement is what is contained in his statement, that another beating was going to occur on that same beat up victim with his shovel in the woods that he drove them to, you must find him guilty of first degree murder because accountability says you aided in an offense. It doesn't matter that he only believed it to be a beating, according to his word.

The law holds you responsible for the consequences of your act. If you supply a gun for a shooting, you're guilty of the shooting. If you supply the knife for a stabbing, you're guilty of the stabbing. If you supply the shovel, you're guilty of the burial of that boy. He is guilty of first degree murder. But for Clyde Rutherford's actions, Stanley Brown might be here."

When the defendant objected to this argument, the trial court told the jury it would be instructed on the law after the arguments. It was, correctly.

■ When a prosecutor misstates the law of accountability in closing argument, the error is not grounds for reversal where, as here, the jury is properly instructed. *People v. Allen* (1995), 272 Ill. App. 3d 394; *People v. Underwood* (1982), 108 Ill. App. 3d 846, 439 N.E.2d 1080.

There was no reversible error here. The prosecutor's argument, although somewhat extravagant on the "if you supply" points, was basically consistent with case law. See *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Taylor* (1990), 199 Ill. App. 3d 933, 557 N.E.2d 917.

## ADMISSION OF ITEMS OF EVIDENCE

Clyde contends the trial court committed reversible error when it allowed into evidence the bottle of blood recovered from the swamp, the bloodstained guitar from Nathan's room, and the ax handle and jacket found in Clyde's truck.

■ We find that each item of evidence had probative value in light of the State's accountability theory. When the probative value

of evidence is not substantially outweighed by unfair prejudice, as is the case here, there is no abuse of discretion in admitting the evidence. See *People v. Hobley* (1994), 159 Ill. 2d 272, 637 N.E.2d 992.

For the reasons stated, Clyde's conviction is affirmed.

## ISSUES IN NATHAN RUTHERFORD'S CASE

Nathan raises two issues: (1) whether there was sufficient evidence to find Nathan guilty of the crimes charged; and (2) whether the trial court erroneously refused to instruct the jury on second degree murder.

### THE WEIGHT OF THE EVIDENCE

Nathan contends he cannot be convicted of murder or concealment of a homicidal death because Stan was alive when he left Schiller Woods with his father.

We do not agree.

After taking an active role in Stan's beating, Nathan talked to Stahler about the best way to get rid of Stan. The decision to bury Stan in the woods was jointly made. He knew the reason why Stan was forced to carry a car battery to Hidden Hill—"to have acid to pour on Stanley's body." After the burial, Nathan and Stahler met. They picked up the shovel and an ax handle. Stahler told Nathan what he had done with Stan. Then they went home and went to sleep.

█ Nathan and Stahler were acting in concert. They shared the intent required to commit both crimes. It does not matter that Nathan did not do the actual killing. He knew Stahler was going to kill Stan, then bury the body. That was part of the plan. The jury had more than sufficient evidence to find that Nathan was accountable for Stahler's actions. See *People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746; *People v. Moreno* (1992), 238 Ill. App. 3d 626, 606 N.E.2d 514.

### REFUSAL TO INSTRUCT ON SECOND DEGREE MURDER

Nathan contends he presented enough evidence of mutual quarrel or combat to require the giving of a second degree murder instruction. The contention is based on a portion of Nathan's confession.

█ Nathan said that when he walked into his bedroom Stan tried to hit him with a beer bottle. The confession goes on to say that Nathan then grabbed the bottle and smashed it into Stan's head, causing heavy bleeding. Nathan then began beating Stan with his feet and hands. Stahler helped, using the handle of a toilet plunger. This went on for 10 minutes. Stan was "very out of it." After collect-

ing Stan's blood in a bottle, Nathan kicked him into the shower. That is when Nathan and Stahler discussed the best way to get rid of Stan's body.

Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat. *People v. Austin* (1989), 133 Ill. 2d 118, 125, 549 N.E.2d 331.

This was not mutual combat. This was managed slaughter. There was no instructional error.

CONCLUSION

For the reasons stated, the convictions of Clyde Rutherford and Nathan Rutherford are affirmed.

Judgment affirmed.

CAMPBELL, P.J., and BRADEN, J., concur.