In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2282

John Pecoraro,

Petitioner-Appellant,

v.

Jonathan R. Walls, Warden,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5361--John F. Grady, Judge.

Argued January 10, 2002--Decided April 1, 2002


   Before Posner, Ripple, and Rovner, Circuit
Judges.

   Posner, Circuit Judge.  John Pecoraro was
convicted by a jury in an Illinois state
court in 1987 of murder and sentenced to
death. After exhausting his state
remedies, see People v. Pecoraro, 578
N.E.2d 942 (Ill. 1991), 677 N.E.2d 875
(Ill. 1997), he sought relief from the
judgment through federal habeas corpus,
which the district court denied after an
evidentiary hearing, precipitating this
appeal. Pecoraro challenges the
constitutionality of his conviction but
does not claim that if he was properly
convicted the sentence of death imposed
on him violated any of his federal
constitutional rights. He had a previous
conviction for a murder in which he and
some friends, after abducting and
shooting their victim, doused the body
with gasoline, lit it, and watched it
burn for some time, and under Illinois's
death-penalty law--the constitutionality
of which is not questioned in this
appeal--that prior conviction was an
aggravating factor that warranted the
sentence. 720 ILCS 5/9-1(b)(3); see
Coleman v. Ryan, 196 F.3d 793, 796-97
(7th Cir. 1999); People v. Coleman, 660
N.E.2d 919, 939-40 (Ill. 1995). The
sentencing judge thought that Pecoraro's
current crime involved another
aggravating factor as well: "the murder

was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means." 720 ILCS 5/9-1(b)(11).

These are the circumstances of that crime. In December of 1982, Jimmy Christian was found shot dead in his car; the fatal bullet was a .357 magnum. Martha Jackson, who worked with Christian's wife Nadine in a jewelry business, had seen Pecoraro "kissing on" Nadine and had heard him say, upon seeing Jimmy Christian, who also worked for the jewelry company: "She's mine; if I can't have her, nobody will."

Pecoraro was suspected from the first of the murder, but was not charged. However, more than three and a half years later, in August of 1986, he flagged down a police officer and told him that he wanted to turn himself in for a murder. He described the murder briefly to the officer, who had no previous knowledge of it. The officer then arrested him. At the police station, after being given the Miranda warnings, Pecoraro narrated the Christian murder in detail. He explained that he and Nadine had become lovers and that Nadine had complained to him about Christian's beating her and her son and that he had told her he'd kill Christian if she wanted him to. He said that he had used a .45 caliber pistol to murder Christian, not a .357 magnum, and there were a few other, but very minor, discrepancies as well--understandably, in light of the years that had elapsed since the murder. Even the mistake about the caliber of the gun might well have been a memory lapse, especially if Pecoraro owned more than one gun, as most gun owners do, James B. Jacobs & Kimberly A. Potter, "Keeping Guns Out of the 'Wrong' Hands: The Brady Law and the Limits of Regulation," 86 J. Crim. L. & Criminology 93, 103 n. 65 (1995), although there is no evidence one way or another on whether Pecoraro did.

A prosecutor reduced Pecoraro's statement to writing, but Pecoraro refused to sign it, saying, "I don't want to go to jail over this. I just want to get it off my chest." Before trial he tried to get the statement suppressed on the ground that he had been so far under the influence of cocaine and beer that he

could not make a voluntary statement. After hearing witnesses for both sides (including Pecoraro), the judge denied the motion. The principal evidence for the prosecution at trial was Pecoraro's confession, corroborated by the circumstances in which Christian had been killed, which Pecoraro would have been unlikely to know had he not been the murderer, and by Martha Jackson's testimony, which supplied the motive for the killing. Doubtless fearing impeachment by his prior murder conviction (as well as by another conviction, for shooting a teenage girl), Pecoraro did not take the stand.

The principal argument pressed on this appeal is that the prosecution failed to turn over possibly exculpatory evidence to the defense, in violation of the rule of Brady v. Maryland, 373 U.S. 83, 86 (1963). In evaluating this and Pecoraro's other arguments, we are confined to the standard that Congress adopted in the Antiterrorism and Effective Death Penalty Act to govern federal courts' review, in habeas corpus proceedings, of adjudications by state courts of the merits of challenges to state convictions. The Act authorizes us to upset such a conviction only if the state courts' adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. sec. 2254(d)(1). As held in Valdez v. Cockrell, 274 F.3d 941, 946-47, 951-52 (5th Cir. 2001), and assumed in other cases, United States v. Pierson, 267 F.3d 544, 550, 556 (7th Cir. 2001); Williams v. Coyle, 260 F.3d 684, 697-98 (6th Cir. 2001), this standard is applicable even though the district judge held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication; that is true; but we do not see why it should alter the standard of federal review.

The Brady doctrine is of course clearly established law determined by the Supreme Court; the only question concerning the doctrine in this case is whether it was unreasonably applied. In February of 1983, three months after the murder, Martha Jackson signed an affidavit

stating that she had solicited Pecoraro to kill her husband for $4,000; she had already admitted this to the police, as recorded in several police reports. She was arrested, and agreed at the request of the police to meet with Pecoraro and secretly record their conversation; the police hoped he would admit to her that he was the murderer of Jimmy Christian. The effort to incriminate Pecoraro failed. Jackson was released from custody and never charged with her crime. The details of her agreement with Pecoraro, as she described them to the police, were odd: Pecoraro insisted that they put the deal in writing and that the $4,000 be paid in weekly installments of $20-30. The writing was not produced. Nor was the agreement carried out, or Jackson's husband harmed.

The prosecution turned the police reports of Jackson's statements over to the defense, but not her affidavit. Pecoraro argues that it could have been used to undermine her credibility as a witness by establishing that she had a motive to play ball with the police by testifying against him. A failure to turn over potentially exculpatory evidence is actionable, however, only if material, that is, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickter v. Greene, 527 U.S. 263, 280 (1999), quoting United States v. Bagley, 473 U.S. 667, 682 (1985) (concurring opinion); see also Wood v. Bartholomew, 516 U.S. 1, 5 (1995) (per curiam); Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999); In re United States, 267 F.3d 132, 135 (2d Cir. 2001). Since Jackson's affidavit merely repeated what was in the police reports, we cannot say that it was unreasonable for the state courts to conclude that it was unlikely that the defense could have used the affidavit to produce an acquittal. Granted that it was signed and under oath and the police reports were merely hearsay reports of what Jackson had told the police, they were admissible hearsay because Jackson's admission that she had hired Pecoraro to kill her husband was an admission against her penal interest. People v. Williams, 737 N.E.2d 230, 241-42 (Ill. 2000); People v. Cruz, 643 N.E.2d 636, 650-51 (Ill. 1994); People v. Rutherford, 653 N.E.2d 794, 800 (Ill.

App. 1995); People v. Kokoraleis, 501 N.E.2d 207, 220-21 (Ill. App. 1986). Anyway a document doesn't have to be admissible as substantive evidence in order to be used for purposes merely of impeaching a witness (or refreshing his recollection). In re Estate of Rennick, 692 N.E.2d 1150, 1157 (Ill. 1998). Nor is there any suggestion that either Jackson or the police would if asked have denied that she had admitted her criminal act. In short, the incremental effectiveness of the affidavit for purposes of impeachment would have been negligible-- or so at least the state courts could, and did, reasonably conclude, which, to repeat, is the only issue for this court.

Defense counsel did not, however, use even the police reports in cross-examination of Jackson and so her solicitation of Pecoraro to murder her husband never was brought to the jury's attention. Pecoraro argues that this failure constituted ineffective assistance of counsel. The concern of defense counsel was that if Jackson were cross-examined about the solicitation, the jury would learn that it was Pecoraro whom she had hired and that this would doom him in the jury's eyes; realistically, a limiting instruction would not have been likely to cause the jury to disregard so dramatic a bit of evidence of Pecoraro's willingness to kill people. See Shepard v. United States, 290 U.S. 96, 104 (1933) (Cardozo, J.); United States v. Bowie, 142 F.3d 1301, 1306 n. 4 (D.C. Cir. 1998); United States v. Daniels, 770 F.2d 1111, 1118 (D.C. Cir. 1985); United States v. Delli Paoli, 229 F.2d 319, 321 (2d Cir. 1956) (L. Hand, J.), aff'd, 352 U.S. 232 (1957); 1 Kenneth S. Brown et al., McCormick on Evidence sec. 59, p. 260 (5th ed. 1999). In determining the harm (anessential element of the constitutional doctrine of ineffective assistance of counsel) caused by a lawyer's tactical decision, we must be realistic rather than formalistic. We must consider whether the tactical decision was reasonable given a realistic understanding of jury behavior, rather than indulge the fiction that jurors always obey the judge's instructions however much the instructions go against the grain. There is no doubt that if Pecoraro's lawyer had allowed the jury to learn about his deal with Jackson and

Pecoraro had been convicted, we would be confronting a claim that the lawyer had made a tactical decision so mistaken as to constitute ineffective assistance of counsel--and it would be a stronger claim than the one urged here.

As Pecoraro's current counsel argues, however, since the identity of the killer-for-hire was not important to Jackson's credibility, the trial judge might well have granted a motion in limine to forbid her to mention his name if she was cross-examined about hiring someone to kill her husband. Even so, we have trouble seeing what value the solicitation would have had in cross-examination, other than to blacken her name. It is doubtful that the judge would even have permitted it to be used to cross-examine her. Jackson was not testifying under any promise of leniency, or pursuant to any other deal with the prosecution--she had never made a deal with the prosecution, even when she wore a wire in an effort to gather evidence that Pecoraro was indeed the murderer of Jimmy Christian. And by the time she testified at Pecoraro's trial in 1987 the statute of limitations on prosecuting her for solicitation for murder had run, see 720 ILCS 5/3-5(b); People v. Thingvold, 584 N.E.2d 89, 90-91 (Ill. 1991); United States v. Parades, 751 F. Supp. 1288, 1292-93 and n. 4 (N.D. Ill. 1990)--and anyway she could not have been convicted on her bare confession of that crime, because her confession was uncorroborated. People v. Hernandez, 521 N.E.2d 25, 37 (Ill. 1988); People v. Neal, 489 N.E.2d 845, 850 (Ill. 1985); People v. Willingham, 432 N.E.2d 861, 864 (Ill. 1982); People v. Banks, 678 N.E.2d 348, 357 (Ill. App. 1997). She had nothing to gain from cooperating in the prosecution of Pecoraro.

The only real significance of defense counsel's putting the solicitation crime before the jury would have been to show that Jackson was a bad person, and that is not a proper method of challenging credibility when as in this case the alleged criminal conduct sought to be used to impeach the witness did not result in a conviction. People v. Bull, 705 N.E.2d 824, 837 (Ill. 1998). It is true that "the defendant may show or inquire into the fact that a witness has been arrested or otherwise charged with a

crime where it would reasonably tend to show that the witness' testimony might be influenced by interest, bias, or a motive to testify falsely," id.; see also Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); People v. Lucas, 603 N.E.2d 460, 474 (Ill. 1992), but we have just seen that Jackson's criminal offense would not have shown any of these things.

Furthermore, on December 11, 1982, just three days after the murder of Jimmy Christian, Martha Jackson had told the police about Pecoraro's romantic involvement with Christian's wife and said she had suspected Pecoraro as soon as she had heard that Christian was missing. Although prior consistent statements of a witness normally are inadmissible hearsay, they are admissible to rebut a claim that the witness's later consistent statement was a fabrication. People v. Williams, 588 N.E.2d 983, 1003 (Ill. 1991); People v. Titone, 505 N.E.2d 300, 304 (Ill. 1986); see also Fed. R. Evid. 801(d)(1)(B); United States v. Stoecker, 215 F.3d 788, 791 (7th Cir. 2000); United States v. Patterson, 23 F.3d 1239, 1247 (7th Cir. 1994). So if defense counsel had tried to impeach Jackson's testimony with the solicitation, arguing that it showed that her testimony was a fabrication designed to curry favor with the authorities, the prosecution could have introduced her December 11 statement, made before she was accused or, so far as appears, suspected of having tried to hire someone to kill her husband. Not only would the admission of that statement have scotched the effort to impeach her with the solicitation; it would have shown that Pecoraro was suspected of Christian's murder from the start and so it would have undermined defense counsel's argument to the jury that Pecoraro's confession had "come out of the blue," a product of his inebriation. Moreover, to bolster the credibility of the December 11 statement, the prosecution would probably have been permitted to present evidence that Jackson had hired Pecoraro to murder her husband, since that would show that Jackson had good reason to suspect Pecoraro of being capable of murdering someone else, namely Jimmy Christian.

Mention of inebriation brings us to the only other argument that warrants

discussion--that defense counsel was ineffective for failing to call as a witness an expert on the effects of mind-altering substances, who would testify that Pecoraro might, under the influence of these substances, have confessed to a murder that he had not committed. The argument is based on an affidavit that Pecoraro's current counsel has obtained from a clinical psychologist.

There have been false confessions, including false volunteered confessions, as distinct from false confessions extracted by torture, fraud, or other coercive means. Smith v. United States, 348 U.S. 147, 153 (1954); O'Guinn v. Dutton, 88 F.3d 1409, 1416-17 (6th Cir. 1996) (en banc) (per curiam) (concurring opinion); Hugo Adam Bedau & Michael L. Radelet, "Miscarriages of Justice in Potentially Capital Cases," 40 Stan. L. Rev. 21, 62-63 (1987). Conceivably they are more likely to be made by people under the influence of drugs or alcohol than by the sober, since drugs and alcohol reduce inhibitions; but actually there is very little evidence of drug- or alcohol-induced false confessions. See id. at 63; State v. Burns, 691 P.2d 297, 302 (Ariz. 1984); State v. Baker, 606 P.2d 120, 123 (Kan. App. 1980). In any event, the trial judge probably would not have allowed an expert to testify for Pecoraro on this issue. An expert witness must base his testimony on the facts. Not that he has to know the facts himself; they can be established by other witnesses and then used as the premise for his testimony. Hulman v. Evanston Hospital Corp., 631 N.E.2d 322, 329 (Ill. App. 1994); Nelson v. Speed Fastener, Inc., 428 N.E.2d 495, 498-99 (Ill. App. 1981); Elcock v. Kmart Corp., 233 F.3d 734, 756 n. 13 (3d Cir. 2000); Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 648 (10th Cir. 1991). But the facts must somehow be gotten into the record for expert testimony premised on them to be admissible.

At the pretrial evidentiary hearing on Pecoraro's motion to suppress his confession as involuntary, see, e.g., United States v. Walker, 272 F.3d 407, 413 (7th Cir. 2001), several witnesses testified to his having on the day of the confession and the night before imbibed large quantities of beer and cocaine, while several police officers testified

that he appeared to be sober and the judge found the officers more credible. The principal witness on Pecoraro's side, however, was Pecoraro himself, and he would not have given evidence at trial about his inebriation because to do so would have exposed him to impeachment with his prior murder conviction. (A defendant can, as Pecoraro did, testify at a pretrial suppression hearing without waiving his Fifth Amendment right not to take the stand at trial. Simmons v. United States, 390 U.S. 377, 393-94 (1968); United States v. Meyer, 157 F.3d 1067, 1080 n. 5 (7th Cir. 1998); United States v. Bounos, 693 F.2d 38, 39 (7th Cir. 1982); United States v. Smith, 783 F.2d 648, 650 (6th Cir. 1986).) As a result, the expert's testimony would have lacked a factual foundation.

What is more, the expert's affidavit states only that inebriation might have caused Pecoraro to fabricate a confession, not that it was likely to do so. Drugs or liquor are more likely to induce an involuntary though true confession than a fabricated one. The expert's "might have caused" testimony would have carried little weight with the jury (quite apart from the fact that jurors are unsympathetic to users of illegal drugs), and the state would have had no difficulty procuring an expert on the other side. Pecoraro's current counsel has also made no effort to show that reasonably competent defense counsel at the time of trial would have found as supportive an expert as current counsel discovered years later. Miller v. Anderson, 255 F.3d 455, 457 (7th Cir. 2001). (The judgment in Miller, but not the opinion, was vacated by reason of supervening mootness. 268 F.3d 485 (7th Cir. 2001) (per curiam).) And, to sound a recurrent note in this opinion, the issue for us is not whether we think defense counsel fell down on the job by failing to find an expert who might have been permitted to testify about Pecoraro's consumption of cocaine and beer on the day of the confession; it is whether the state courts were unreasonable in concluding that defense counsel did not in this or any other respect fall below minimum professional standards to the prejudice of their client. The answer to that question is no.

Affirmed.