NOTICE: Under Supreme Court Rule 367 a party has 21 days after the filing of the opinion to

request a rehearing. Also, opinions are subject to modification, correction or withdrawal at

anytime prior to issuance of the mandate by the Clerk of the Court. Therefore, because the

following slip opinion is being made available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The official copy of the following opinion

will be published by the Supreme Court's Reporter of Decisions in the Official Reports advance

sheets following final action by the Court.

                                    

                  Docket No. 78457--Agenda 4--May 1996.

    THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN PECORARO,

                               Appellant.

                     Opinion filed February 6, 1997.

                                    

     JUSTICE NICKELS delivered the opinion of the court:

     Following a jury trial in the circuit court of Cook County,

defendant, John Pecoraro, was found guilty of murder (Ill. Rev.

Stat. 1981, ch. 38, par. 9--1) in connection with the shooting

death of Jimmy Christian. Thereafter a capital sentencing hearing

was conducted before the trial court and defendant was sentenced

death. Defendant's conviction and sentence were affirmed on direct

appeal. People v. Pecoraro, 144 Ill. 2d 1 (1991). Defendant

subsequently filed a petition for relief under the Post-Conviction

Hearing Act. 725 ILCS 5/122--1 et seq. (West 1994). The State filed

a motion to dismiss defendant's petition and the circuit court

granted the motion. Defendant appeals directly to this court

pursuant to Supreme Court Rule 651 (134 Ill. 2d R. 651). We note

that defendant has filed briefs through counsel and has also

submitted a pro se brief. For the reasons set forth we affirm the

judgment of the circuit court.

                                BACKGROUND

     On Wednesday, December 8, 1982, the body of the victim, Jimmy

Christian, was discovered in his brown Oldsmobile, which was parked

near the premises of a small manufacturing company in Chicago. The

owner and an employee of the company had observed that the

Oldsmobile had been parked in the same spot and had not moved since

Monday, December 6. The cause of the victim's death was a gunshot

wound to the chest.

     The record reveals that defendant worked with the victim's

wife, Nadine Christian, for a company called Parklane Jewelry. The

detectives investigating the murder apparently considered defendant

a suspect and interviewed him in connection with the crime, but

were initially unable to obtain sufficient evidence to support

charges against defendant. The turning point in the case occurred

several years after the offense. On August 6, 1986, at about 9

a.m., defendant flagged down a police car driven by Chicago police

officer Jeffrey Becker. Defendant stated that he wanted to confess

to a murder. Officer Becker placed defendant under arrest and

administered his Miranda warnings. Defendant informed Officer

Becker that he had killed Jimmy Christian. Defendant related that

he waited outside the victim's house. When the victim emerged,

defendant forced the victim at gunpoint into the victim's

automobile. Defendant drove to a certain location and shot the

victim. Defendant indicated that the murder weapon was a .45-

caliber handgun and that he disposed of the weapon in the Chicago

River.

     After Officer Becker transported defendant to the police

station, defendant was interviewed by Detectives William Kaupert

and Peter Aipaia and later by Assistant State's Attorney Joseph

Barbaro. Before each interview, defendant was advised of his

Miranda rights. Assistant State's Attorney Barbaro prepared a

handwritten statement detailing defendant's account of the crime.

Defendant refused to sign the statement, indicating that he only

wanted to get the crime "off his chest," but did not want to go to

prison. The handwritten statement was read to the jury at trial

without objection by the defense. Defendant's account to the

detectives and assistant State's Attorney was similar to his

account to Officer Becker. He stated that he waited for the victim

to leave for work, forced the victim into his own car and drove the

car a few blocks from the Christian home where he shot the victim

in the chest with a .45-caliber handgun. With respect to his motive

for the crime, defendant indicated that he had been involved in a

romantic relationship with the victim's wife, Nadine, and that he

did not like the way the victim treated Nadine.

     Prior to trial, defendant moved to suppress his statements to

police on the basis that he had consumed substantial quantities of

drugs and alcohol and was fatigued when he spoke with police.

Defendant claimed that he was unable to knowingly and intelligently

waive his rights under Miranda. The trial court denied the motion.

     At trial, the State presented the testimony of Martha Jackson,

a coworker of defendant and Nadine Christian at Parklane Jewelry.

Jackson testified that she and Nadine had met defendant in August

1982, and Nadine recruited defendant to work for Parklane. Jackson

observed defendant and Nadine spending a lot of time together. On

one occasion during a celebration at a tavern, Jackson observed

defendant and Nadine kissing. Jackson joked that Nadine's husband

was coming through the door. Defendant made an obscene gesture and

stated that if he could not have Nadine, nobody could. Jackson also

testified that on one occasion she observed defendant armed with a

handgun in a shoulder holster. She told police the gun was a .45-

caliber weapon.

     Defendant presented evidence that subsequent to his statements

to the authorities, it was determined that the bullet that killed

the victim was fired from a .357-caliber weapon rather than a .45-

caliber weapon. Defendant's former wife testified that on December

6, 1982, she and defendant woke up together at about 6:30 a.m. and

defendant drove her to work, arriving at about 8:20 a.m.

     Defendant also presented the testimony of Lisa Shankman, who

was defendant's girlfriend in August 1986. Shankman testified that

defendant was a regular cocaine user and she was familiar with the

manner in which cocaine affected defendant. Shankman saw defendant

briefly at about 5 p.m. on August 5, 1986, the day before his

arrest, and he appeared to have been drinking or to have been under

the influence of some substance. Shankman next saw defendant at

8:30 the next morning and it appeared he was definitely "high on

something." It was stipulated that Jean Clark, a bartender or

waitress, would testify that on the evening of August 5, 1986, she

served defendant a number of drinks. It was further stipulated that

Clark would testify that on a few occasions she observed defendant

go into the washroom and on his return he would appear to be "more

hyper and more talkative" than before.

     Based on the foregoing evidence, the jury found defendant

guilty of murder. The trial court found defendant to be eligible

for the death penalty because he had a prior murder conviction (see

Ill. Rev. Stat. 1981, ch. 38, par. 9--1(b)(3)), and sentenced him

to death.

                      THE POST-CONVICTION HEARING ACT

     The Post-Conviction Hearing Act permits a defendant to mount

a collateral attack on his conviction and sentence based on

violations of his constitutional rights. People v. Coleman, 168

Ill. 2d 509, 522 (1995); People v. Mahaffey, 165 Ill. 2d 445, 452

(1995). The scope of post-conviction review is limited to matters

which have not been, and could not have been, previously

adjudicated. Coleman, 168 Ill. 2d at 522; People v. Brisbon, 164

Ill. 2d 236, 245 (1995). Determinations of the reviewing court on

direct appeal are res judicata as to issues actually decided, and

issues that could have been raised on direct appeal but were not

are waived. Coleman, 168 Ill. 2d at 522; Mahaffey, 165 Ill. 2d at

452. Moreover, a defendant is entitled to an evidentiary hearing on

a post-conviction claim only if he has made a substantial showing,

based on the record and supporting affidavits, that his

constitutional rights were violated. Coleman, 168 Ill. 2d at 537;

People v. Guest, 166 Ill. 2d 381, 389 (1995). With these principles

in mind, we review the dismissal of defendant's post-conviction

petition without an evidentiary hearing.

                                 ANALYSIS    

          I. Failure to Disclose or Preserve Exculpatory Evidence

     Defendant contends that the prosecution violated its

constitutional obligation under Brady v. Maryland, 373 U.S. 83, 10

L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and its progeny to disclose

to the defense various evidence that defendant characterizes as

exculpatory. Brady held that "the suppression by the prosecution of

evidence favorable to an accused upon request violates due process

where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution."

Brady, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97.

Subsequently, however, the Court held that regardless of whether

specifically requested by the defense, favorable evidence is

material and its suppression by the State constitutes a

constitutional violation "if there is a reasonable probability

that, had the evidence been disclosed to the defense, the result of

the proceeding would have been different." United States v. Bagley,

473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct 3375, 3383

(1985), quoted in Kyles v. Whitley, 514 U.S. ___, ___, 131 L. Ed.

2d 490, 505, 115 S. Ct. 1555, 1565 (1995). Moreover, the disclosure

obligation applies to impeachment evidence as well as evidence

bearing directly on guilt or innocence. United States v. Bagley,

473 U.S. 667, 676, 87 L. Ed. 2d 481, 490, 105 S. Ct 3375, 3380

(1985); see Kyles v. Whitley, 514 U.S. ___, ___, 131 L. Ed. 2d 490,

505, 115 S. Ct. 1555, 1565 (1995).

             A. Self-incriminating Statements by a Third Party

     Initially, defendant claims that the State had knowledge that

another individual, Ronald Baker, had confessed to the murder of

Jimmy Christian, but the State failed to disclose this information

to defendant. Defendant's post-conviction petition includes the

affidavit of a defense investigator who interviewed the Reverend

Jerry Gibson. During the interview, Reverend Gibson related that he

had spoken with Ronald Baker in connection with Baker's marital

troubles and Baker acknowledged having at some point made the

statement, "Yes I killed Jimmy Christian, and I'll kill you too."

Reverend Gibson believed that this statement had been addressed to

Brian Diffy, and that Baker made the threat because he suspected

that his wife and Diffy were having an affair. Reverend Gibson told

the defense investigator that he had informed the police of Baker's

statements and other information concerning the Jimmy Christian

murder. Subsequent to the interview, Reverend Gibson informed the

defense investigator that he did not want to become involved in the

case again, but that he would testify pursuant to a subpoena. We

note that defendant also submitted an affidavit by Brian Diffy

which would appear to indicate that any threat by Baker against

Diffy was not made directly to Diffy. In his affidavit, Diffy

stated, "About three or four months after Jimmy Christian's murder,

I heard that Ronald Baker said he had killed Jimmy Christian and

would kill me too if I didn't leave his wife alone."

     Defendant argues that the information that Ronald Baker had

admitted to killing Jimmy Christian was essential to the defense

and would have been devastating to the State's case. Defendant

apparently assumes, without offering any analysis, that Ronald

Baker's alleged confession would have been admissible into evidence

had defense counsel known about it and sought to introduce it. The

general rule, however, holds to the contrary. An extrajudicial

declaration, not under oath, by the declarant that he, and not the

defendant on trial, committed the crime is inadmissible as hearsay,

though the declaration is against the declarant's penal interest.

People v. Cruz, 162 Ill. 2d 314, 342 (1994); People v. House, 141

Ill. 2d 323, 389-90 (1990); People v. Bowel, 111 Ill. 2d 58, 66

(1986); see People v. Rutherford, 274 Ill. App. 3d 116, 123 (1995).

Such a declaration will be admitted, however, when justice

requires. Cruz, 162 Ill. 2d at 343. Where there are sufficient

indicia of trustworthiness, such out-of-court statements may be

admissible as an exception to the hearsay rule. Cruz, 162 Ill. 2d

at 343; Bowel, 111 Ill. 2d at 66.

     In Chambers v. Mississippi, 410 U.S. 284, 35 L. Ed. 2d 297, 93

S. Ct. 1038 (1973), the United States Supreme Court identified four

factors present in that particular case underlying the Court's

decision that the defendant was constitutionally entitled to

introduce evidence of an extrajudicial third-party confession

notwithstanding a common law rule of evidence barring the use of

such confessions. The four factors in Chambers were: (1) the

statement was made spontaneously to a close acquaintance shortly

after the crime occurred; (2) the statement was corroborated by

other evidence; (3) the statement was self-incriminating and

against the declarant's interest; and (4) there was adequate

opportunity for cross-examination of the declarant. Chambers, 410

U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49; see

Cruz, 162 Ill. 2d at 343. The Chambers factors are merely

guidelines to admissibility rather than "hard and fast

requirements" (House, 141 Ill. 2d at 390, citing Bowel, 111 Ill. 2d

at 67) and the presence of all four factors is not a condition of

admissibility (Cruz, 162 Ill. 2d at 343). Ultimately, admissibility

depends on whether the statement was made under circumstances that

provide considerable assurance of its reliability by objective

indicia of trustworthiness. Chambers, 410 U.S. at 300-01, 35 L. Ed.

2d at 311-12, 93 S. Ct. at 1048-49; Cruz, 162 Ill. 2d at 343;

Bowel, 111 Ill. 2d at 67.

     Consideration of the four specific Chambers criteria does not

favor admissibility. While Ronald Baker's alleged statement was

self-incriminating and against interest, defendant has failed to

establish the other three factors. See People v. Keene, 169 Ill. 2d

1, 29-30 (1995) (statement would not have been admissible where

only Chambers factor present was that statement was self-

incriminating). First, it is not known when Baker made his

statement, or whether he made the statement to a close

acquaintance. Indeed, the identity of the person to whom the

statement was addressed is unknown. Second, there appears to be no

meaningful or substantial corroboration of any statements

implicating Ronald Baker in the Jimmy Christian murder. Third,

assuming that Baker made the self-incriminating statement that has

been attributed to him, defendant has failed to establish that

Baker would have been available for cross-examination with regard

to the statement. Baker might very well have asserted his privilege

against self-incrimination rather than answer questions pertaining

to any self-incriminating statements. Cf. Keene, 169 Ill. 2d at 30.

More generally, Baker's alleged statement was not made under

circumstances that provide considerable assurance of its

reliability by objective indicia of trustworthiness. The statement

admitting to the murder was coupled with a threat apparently borne

of jealousy. As such, the self-incriminating portion of the

statement ("I killed Jimmy Christian") may simply represent bravado

designed to bolster the threat ("and I'll kill you too").

     Because Ronald Baker's alleged self-incriminating statements

would not have been admissible, there is no reasonable probability

that disclosure of Reverend Gibson's report of the statement to

police would have affected the outcome of defendant's trial.

Accordingly, defendant has failed to establish that the allegedly

undisclosed information was material giving rise to a

constitutional obligation to disclose.

                          B. Impeachment Evidence

     Defendant next contends that the State failed to disclose

certain information that would have been valuable in impeaching

prosecution witness Martha Jackson. The record contains police

reports indicating that Jackson was arrested for soliciting the

murder of her husband based on information provided by a

confidential informant. While a police report indicates that

Jackson confessed to the offense, she was released shortly after

her arrest. Subsequently, Jackson apparently agreed to wear an

electronic eavesdropping device--a "wire"--and to engage defendant

in conversations designed to elicit self-incriminating statements

about the Jimmy Christian murder and the plot to kill Martha

Jackson's husband. The police filed an application with the circuit

court pursuant to section 108A--3 of the Code of Criminal Procedure

of 1963 (725 ILCS 5/108A--3 (West 1994)) for authorization to use

an eavesdropping device to monitor conversations between Jackson

and defendant or certain other individuals. The application was

supported by an affidavit from Jackson in which she averred that

she had entered into a written contract with defendant pursuant to

which defendant agreed to kill Jackson's husband in exchange for

$4,000.

     Defendant first argues that Martha Jackson's affidavit was not

disclosed to the defense at trial, and consequently defendant was

deprived of the ability to impeach her based on her sworn

confession to soliciting the murder of her husband. The parties

disagree as to whether the post-conviction petition sufficiently

alleges that the affidavit was in fact withheld from defense

counsel. However, defendant's argument is meritless in any event.

A witness may be impeached by attacking his or her character with

proof of a conviction of a crime punishable by death or

imprisonment of one year or more or of a crime that involves

dishonesty or false statements. People v. Montgomery, 47 Ill. 2d

510, 516-19 (1971); In re A.M., 274 Ill. App. 3d 702, 712 (1995).

However, only actual convictions may be used for this purpose:

proof of arrests, indictments, charges or the actual commission of

a crime are not admissible. People v. Franklin, 167 Ill. 2d 1, 21

(1995); People v. Lucas, 151 Ill. 2d 461, 491 (1992); In re A.M.,

274 Ill. App. 3d at 712. Had Martha Jackson been convicted of

soliciting the murder of her husband, evidence of the conviction

would have been admissible for impeachment purposes. However,

defendant was not entitled to impeach Jackson with independent

proof that she committed that offense. Since Jackson's affidavit

was inadmissible, it could not have affected the outcome of trial,

and thus the confession was not material for purposes of Brady and

its progeny.

     Defendant also contends that the State violated his right to

due process by failing to disclose the identity of the confidential

informant who originally implicated Martha Jackson in a plot to

kill her husband. Defendant insists that "[h]ad the defense been

able to investigate Jackson's attempt on her husband's life, her

fragile credibility may have come completely unraveled." Since,

Martha Jackson's possible participation in an unrelated crime which

did not result in a conviction was not a proper basis for

impeachment, the identity of the confidential informant was in no

way material or relevant to this case.

     Defendant also surmises that in view of the circumstances of

Martha Jackson's arrest and release, Jackson must have entered into

an agreement with the authorities whereby, in exchange for her

cooperation in the investigation of defendant, no charges would be

filed against Jackson arising from the plot to kill her husband.

Defendant contends that evidence of such an agreement would have

discredited Jackson's trial testimony by showing a motive to

testify in the State's favor. This issue was raised and rejected on

direct appeal. In his pro se brief on direct appeal, defendant

advanced the following argument:

               "[T]he prosecution with-held [sic] vital impeachment

          evidence from the defendant., [sic] on the state's

          witness Martha Jackson it is a fact that through the

          reports of the police, and the special prosecutions

          office., [sic] that Martha Jackson was released from

          custody for her cooperation that charges for solicitation

          for murder was [sic] droped [sic], and that she was

          claiming that the defendant, was a co-defendant in that

          case., [sic] the prosecutions [sic] failure to tender the

          deals made with the state's witness denied the defendant

          a fair trial."

This court rejected the argument, finding, inter alia, that

"defendant did not show that the discovery material purportedly

withheld from the defense would have been favorable to defendant or

material to his guilt or punishment." People v. Pecoraro, 144 Ill.

2d 1, 20 (1991). The principles of res judicata bar relitigation of

this issue.

     Even if the issue were properly before us, our decision would

be no different. Assuming, arguendo, that the State actually

promised Jackson leniency in exchange for her cooperation in the

investigation, the nondisclosure of the agreement would not have

impaired the defense in view of other information that was in fact

disclosed. The record shows that defense counsel had knowledge from

police reports of essentially the same information that defendant

presently relies on as circumstantial evidence of an agreement or

promise of leniency. Trial counsel's affidavit submitted in support

of the post-conviction petition states:

               "I had received police reports which related that

          the police had arrested Martha Jackson on suspicion of

          solicitation to murder her husband. Thereafter, she was

          released, and arrangements were made to secure her

          cooperation in attempting to prove John Pecoraro's

          complicity in the murder of Jimmy Christian. This

          included having her set up a meeting with John Pecoraro

          and `wiring' Martha Jackson when she met with John

          Pecoraro."

If, as defendant argues, this information is presently sufficient

to create an inference that Jackson had an agreement with the

State, then there is no reason why defendant could not have relied

on the same inference at trial to discredit Jackson's testimony.

Armed with information regarding the circumstances of Jackson's

involvement in the case, trial counsel was fully equipped to probe

the witness' possible bias or motive to fabricate based on any

explicit or implicit agreements or promises of leniency. However,

counsel made a decision, presumably as a matter of strategy, not to

pursue this approach. Granted, definitive proof at trial of an

agreement would have been preferable to circumstantial proof. Even

so, we regard it as highly unlikely that any nondisclosure affected

either trial strategy or the ultimate outcome of trial.

             C. Disclosure of Impeachment Evidence to the Jury

     In a related claim, defendant asserts that in addition to its

disclosure obligations to the defense, the prosecution was

constitutionally required to inform the jury of the circumstances

of Martha Jackson's involvement in this case. In support of this

argument, defendant relies, in part, on People v. Holmes, 238 Ill.

App. 3d 480 (1992). In Holmes, the court stated that "[i]t is well

settled that if a witness offers testimony in exchange for some

beneficial treatment from the State, the State must disclose that

information to the jury." Holmes, 238 Ill. App. 3d at 490-91. The

cases cited in Holmes--Napue v. Illinois, 360 U.S. 264, 3 L. Ed. 2d

1217, 79 S. Ct. 1173 (1959), Giglio v. United States, 405 U.S. 150,

31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), and People v. Bolton, 10

Ill. App. 3d 902 (1973)--do not stand for this broad proposition.

     In Napue a witness at a murder trial falsely testified that he

received no consideration from the State in exchange for his

testimony. While the assistant State's Attorney was aware that the

testimony was false, he took no action to correct it. The Court

reversed the defendant's conviction. The Court noted that a

conviction through the use of evidence known by the State to be

false must be reversed, and the same result obtains when the State,

although not soliciting false evidence, allows it to go uncorrected

when it appears. The Court further noted that it was of no

consequence that the false testimony bore upon the witness'

credibility rather than directly upon guilt or innocence.

Similarly, in Bolton, a State's witness also falsely denied the

existence of an agreement with the State, and the State failed to

correct the false testimony. In Giglio, the Court held that a

promise made to a witness by one attorney for the government would

be attributed to the prosecution. In Giglio, the Court reversed the

defendant's conviction where a prosecution witness falsely denied

that any promises of leniency had been made, even though the

prosecutor appearing at trial was personally unaware of the falsity

of the testimony. Accordingly, in each of these cases, the

prosecution's obligation to reveal the existence of an agreement

with a witness arose only because of the witness' false testimony

on the subject. These cases merely impose an obligation to correct

false evidence. Under our adversarial system, the State is not

required in the first instance to impeach its own witnesses with

all evidence bearing on their credibility.

     In addition to Holmes, defendant cites certain federal court

decisions which also appear to suggest that the prosecution has an

affirmative duty to inform the jury of any agreements or promises

of leniency to its witnesses. See Campbell v. Reed, 594 F.2d 4, 7

(4th Cir. 1979) (stating that Giglio held that "the prosecution's

failure to present all material evidence to the jury constituted a

denial of due process"); United States v. Pope, 529 F.2d 112, 114

(9th Cir. 1976) (citing Giglio as holding that "[i]t is

inconsistent with the rudimentary demands of a fair trial for the

prosecuting attorney to fail to disclose to the court that a

material prosecution witness has had the benefit of a plea

bargain"). To the extent these cases stand for this proposition,

like Holmes, they reflect a misreading of the applicable United

States Supreme Court decisions. Defendant does not contend that

Martha Jackson testified falsely regarding any agreement with the

State or the circumstances surrounding her involvement with this

case. Accordingly, the State was not obligated to disclose this

information to the jury.

                       D. Tape-Recorded Conversation

     As previously noted, Martha Jackson engaged in a conversation

with defendant while wearing a "wire" in an attempt to elicit

incriminating statements. The conversation was tape-recorded and

defendant presently claims that the tape of the conversation was

withheld from the defense. Apparently, the tape cannot be located

and was unavailable during the post-conviction proceedings below.

Defendant claims that the tape would have been useful to the

defense because during the conversation "Martha Jackson recited

facts *** which later found their way into [defendant's] alleged

oral confession." The only information in the record regarding the

content of the conversation appears in an affidavit executed by

defendant. Having reviewed the affidavit, we conclude there is no

reasonable probability that disclosure of the tape would have

affected the outcome of defendant's trial. Even if defendant had

been able to show that Martha Jackson had discussed the details of

the murder with him, it is unlikely that the jury would have

rejected defendant's confession on that basis. Accordingly,

defendant has failed to show a constitutional violation.

                           E. Polygraph Results

     Defendant next contends that constitutional error occurred

because the State did not reveal to the defense that Ronald Baker

and Martha Jackson "failed" lie detector tests administered in

connection with the investigation of this case. The record reflects

that polygraph examinations were administered to Baker and Jackson.

With respect to the examination of Baker, the examiner concluded

that Baker may have had some knowledge about the Jimmy Christian

murder. With respect to the examination of Jackson, the examiner

concluded that Jackson was untruthful in her answers to questions

regarding her knowledge of a plot to kill her husband and knowledge

of the Jimmy Christian murder. However, defendant's post-conviction

petition, as amended and supplemented, contains no claim that the

prosecution suppressed this information in violation of defendant's

constitutional rights. The Post-Conviction Hearing Act provides

that "[a]ny claim of substantial denial of constitutional rights

not raised in the original or an amended petition is waived." 725

ILCS 5/122--3 (West 1994).

     Considerations of waiver aside, defendant's claim is

meritless. Evidence of polygraph results is inadmissible both at

trial and at a capital sentencing hearing. People v. Sanchez, 169

Ill. 2d 472, 493 (1996). Notwithstanding the inadmissibility of the

polygraph results, defendant argues in a conclusory manner that the

information would have assisted defense counsel in his

investigation of the case. Defendant's claim is based on pure

speculation, which is insufficient to establish a reasonable

probability that the outcome of defendant's trial would have been

different. See Wood v. Bartholomew, 516 U.S. ___, 133 L. Ed. 2d 1,

116 S. Ct. 7 (1995). Accordingly, defendant has failed to establish

that the polygraph results were material for purposes of Brady and

its progeny.

F. Failure to Document Defendant's Condition During Interrogation

                                by Police

     Defendant next contends that his right to due process was

violated because the police failed to preserve evidence bearing on

his physical and mental condition at the time he made incriminating

statements to the authorities. Defendant argues that in view of his

physical appearance and statements he made to police regarding

recent drug use and lack of sleep, the police were obligated to

create an objective record of his condition. According to

defendant, the officers should have conducted or arranged blood or

breath testing to determine the presence of drugs or alcohol, and

should have videotaped defendant's conversations. Defendant

maintains that such evidence would have assisted the defense in

proving that defendant was unable to knowingly and intelligently

waive his rights under Miranda v. Arizona, 384 U.S. 436, 16 L. Ed.

2d 694, 86 S. Ct. 1602 (1966).

     In California v. Trombetta, 467 U.S. 479, 488-89, 81 L. Ed. 2d

413, 422, 104 S. Ct. 2528, 2534 (1984), relied on by defendant, the

United States Supreme Court stated:

          "Whatever duty the Constitution imposes on the States to

          preserve evidence, that duty must be limited to evidence

          that might be expected to play a significant role in the

          suspect's defense. To meet this standard of

          constitutional materiality [citation], evidence must both

          possess an exculpatory value that was apparent before the

          evidence was destroyed, and be of such a nature that the

          defendant would be unable to obtain comparable evidence

          by other reasonably available means."

Trombetta held that when police conduct breath tests to determine

the blood-alcohol level of a motorist suspected of driving while

under the influence of alcohol, due process does not require

preservation of the motorist's breath sample for use by the defense

in verifying the accuracy of the breath test. Based on evidence

showing that the breath-analysis equipment was highly accurate, the

court reasoned that the chances were extremely low that a preserved

breath sample would be exculpatory, and a malfunction in the

breath-analysis equipment could demonstrated in other ways.

     Subsequently, in Arizona v. Youngblood, 488 U.S. 51, 58, 102

L. Ed. 2d 281, 289, 109 S. Ct. 333, 337 (1988), the Court held that

unless a criminal defendant can show bad faith on the part the

police, failure to preserve potentially useful evidence does not

constitute a denial of due process. In so holding, the Court

distinguished the failure to preserve evidence from the failure to

disclose material exculpatory evidence in the State's possession

where the good or bad faith of the State is irrelevant. Youngblood,

488 U.S. at 57, 102 L. Ed. 2d at 289, 109 S. Ct. at 337. The

Youngblood Court also explained that "[t]he presence or absence of

bad faith by the police for purposes of the Due Process Clause must

necessarily turn on the police's knowledge of the exculpatory value

of the evidence at the time it was lost or destroyed." Youngblood,

488 U.S. at 56 n.*, 102 L. Ed. 2d at 288 n.*, 109 S. Ct. at 336

n.*.

     Applying these principles from Trombetta and Youngblood, we

conclude that defendant's claim is meritless. The record reveals

that at the time defendant spoke with police, he informed them that

he had used cocaine a few hours earlier. Defendant also related

either that he had not slept in two days or that he had not slept

the previous night. Nonetheless, at the hearing on defendant's

motion to suppress his statements, the police officers who observed

defendant and the assistant State's Attorney who interviewed him

each testified that defendant did not appear to be intoxicated or

under the influence of drugs. The assistant State's Attorney

specifically testified that although defendant's eyes appeared

bloodshot, "his walking was fine and his speech was fine." In view

of this testimony, defendant cannot show that it was apparent that

videotaping defendant's demeanor or conducting drug and alcohol

testing would have produced exculpatory evidence. Likewise,

defendant cannot show that the authorities acted in bad faith in

failing to take these steps. Cf. United States v. Weise, 89 F.3d

502, 504 (8th Cir. 1996) (failure by police to administer blood-

alcohol test to defendant convicted of second degree murder did not

violate due process where police officers testified that defendant

appeared to be in control of his thoughts and actions at the time

of his arrest).

     Defendant alternatively argues that even if the failure to

preserve evidence of his condition did not violate the United

States Constitution under Trombetta, this court is free to hold

that failure violative of the due process clause of our state

constitution. Ill. Const. 1970, art. I, §2. Defendant relies on

Gunderson v. Municipality of Anchorage, 792 P.2d 673 (Alaska 1990),

where, notwithstanding Trombetta, the Supreme Court of Alaska held

that in a prosecution for driving while intoxicated, the failure to

preserve breath samples for independent testing violated the due

process clause of Alaska's constitution. We decline to apply

Gunderson in the present setting and instead adhere to the well-

reasoned principles set forth in Trombetta and Youngblood for

purposes of our state due process clause.

                            G. Pro Se Arguments

     In his pro se brief defendant advances many of the same

arguments set forth in the brief submitted by counsel regarding

nondisclosure of evidence. Defendant also complains that the State

failed to disclose: (1) the order authorizing the use of an

eavesdropping device to monitor his conversation with Martha

Jackson; (2) a statement by the informant who implicated Martha

Jackson in a plot to kill her husband; (3) that the victim's wallet

had been recovered; (4) any crime laboratory reports regarding the

wallet; and (5) a tape cartridge found in the victim's car.

Defendant has failed to explain how any of the foregoing would be

exculpatory. Defendant also complains that the State failed to

disclose the identity of Tom Wolverton, whom defendant considers a

possible suspect in the case. As will be seen in our discussion

below of defendant's ineffective-assistance-of-counsel claim,

available information regarding Tom Wolverton would not have

affected the outcome of trial and therefore was not material under

Brady and its progeny. Accordingly defendant's pro se arguments are

meritless.

                   II. Ineffective Assistance of Counsel

     Defendant contends that he was deprived of effective

assistance of counsel by the Cook County public defender's office,

which represented him at the hearing on his motion to suppress, and

by the privately retained attorney who represented him at trial. In

support of this claim, defendant submitted an affidavit from an

attorney experienced in the defense of capital cases who reviewed

the record and formed the opinion that the performance of

defendant's trial attorneys was not in conformity with accepted

professional standards for the defense of capital cases and fell

below an objective standard of reasonableness.

     Claims of ineffective assistance of counsel based on deficient

representation of a criminal defendant are evaluated in accordance

with the two-prong test set forth in Strickland v. Washington, 466

U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Initially, the

defendant must show deficient performance. "This requires showing

that counsel made errors so serious that counsel was not

functioning as the `counsel' guaranteed the defendant by the Sixth

Amendment." Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104

S. Ct. at 2064. The defendant must show that counsel's performance

fell below an objective standard of reasonableness. Strickland, 466

U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Moreover,

judicial scrutiny of counsel's performance is highly deferential

and "a court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional

assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action `might be

considered sound trial strategy.' [Citation.]" Strickland, 466 U.S.

at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

     Even where deficient performance is shown, the defendant must

also show prejudice in order to establish an ineffective-assistance

claim. "The defendant must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in

the outcome." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104

S. Ct. at 2068.

A. Trial Counsel's Lack of Experience and Resources and

                  Failure to Present a Coherent Defense

     At the outset we consider defendant's general claim that his

sixth amendment right to effective assistance of counsel was

violated because trial counsel was unqualified to represent him due

to lack of training and experience. Defendant observes that trial

counsel had previously conducted only four jury trials, had no

staff or co-counsel to rely upon, and lacked specific training in

the defense of capital cases. Defendant also notes that his

attorney represented him for a total fee of $200. According to

defendant, his attorney should have requested that the court

appoint co-counsel and provide funds for investigative assistance,

mitigation experts and other experts as needed. As noted in People

v. Lear, No. 78292, slip op. at 7 (February 6, 1997), "[h]aving a

counsel with limited resources and limited experience is not a

circumstance which this court has held to constitute per se

ineffective assistance of counsel." In Lear counsel had only been

out of law school for two years when appointed to represent the

defendant, counsel had never tried a capital or homicide case

before, counsel had received no formal training in defense of

capital cases, counsel's office employed no investigators or other

attorneys, the only assistance counsel received was from another

attorney who performed 60 hours of legal research, and counsel had

numerous other pending cases. As in Lear, counsel's alleged

inexperience and lack of resources in the present case would be

insufficient in itself to give rise to a sixth amendment violation.

Rather, under Strickland's two-part test, defendant must establish

specific errors by counsel and resultant prejudice.

     Defendant also argues that trial counsel presented no coherent

theory of defense to the jury. We emphatically disagree. Faced with

evidence that defendant had approached police on his own initiative

and confessed to the crime, counsel performed competently, albeit

unsuccessfully, in attempting to undermine the State's case.

Counsel presented testimony from defendant's former wife that

defendant was with her on the morning of the crime. Counsel also

elicited testimony from defendant's girlfriend that defendant was

a heavy drug user and might have used drugs, alcohol or both at the

time of his statements to police. While defendant allegedly

confessed to killing the victim with a .45-caliber weapon, counsel

established that the gun used was actually a .357-caliber weapon.

Counsel vigorously cross-examined the State's witnesses and

successfully objected on a number of occasions to the State's

attempts to introduce hearsay testimony. During closing argument,

counsel attempted to discredit defendant's confession, arguing that

he was under the influence of drugs and alcohol and pointing out

the discrepancy in defendant's statements as to the weapon used.

Counsel also argued that defendant's confession omitted certain

details of the offense and that aspects of defendant's account to

police were contrary to human experience. In addition, counsel

emphasized the lack of eyewitnesses and physical evidence

implicating defendant. Defendant's charge that counsel failed to

provide a coherent defense is unfounded.

                   B. Inadequate Pretrial Investigation

     Defendant claims that trial counsel failed to adequately

investigate the possibility that Ronald Baker was responsible for

the murder of Jimmy Christian. Defendant first asserts that counsel

should have interviewed Reverend Jerry Gibson, and that had he done

so, he would have learned of Ronald Baker's alleged admission to

killing Jimmy Christian. As discussed earlier, Baker's allegedly

self-incriminating statements would not have been admissible.

Accordingly, the failure to interview Reverend Gibson did not

affect the outcome of the case and defendant has failed to

establish prejudice under Strickland.

     Defendant also maintains that counsel rendered deficient

performance by failing to interview Baker's former wife, Pat, and

her one-time paramour and present husband, Brian Diffy. Defendant

argues that had counsel done so, he would have learned that Ronald

Baker was a drug addict who sold drugs to support his habit.

According to defendant, counsel also would have learned that Baker

was a violent, jealous and paranoid individual, that the victim

sometimes rode to work with Pat, and that members of Baker's family

once assaulted Diffy because of his relationship with Pat.

Defendant asserts that this information would have supported the

theory that Baker may have killed Jimmy Christian because of

jealousy.

     Defendant's argument is meritless. The record reveals that

Brian Diffy and Pat Diffy (formerly Pat Baker) were each privy to

essentially the same information about Ronald Baker, and thus

interviewing both Pat and Brian (as opposed to one or the other)

would not have advanced counsel's investigation. Defendant's claim

fails because the record does not clearly substantiate the

assertion that trial counsel failed to interview Pat Diffy. Trial

counsel's affidavit submitted with defendant's post-conviction

petition specifically identifies a number of witnesses who were not

interviewed, including Brian Diffy. With respect to Pat Diffy,

however, the affidavit merely indicates that although subpoenaed,

she was not called to testify at trial. The affidavit is silent as

to whether or not she was interviewed. It is also unclear from Pat

Diffy's affidavit whether defense counsel interviewed her. Her

affidavit merely states that she had a "brief conversation" with

defense counsel, but does not detail the content of that

conversation.  

     Defendant also contends that an adequate investigation would

have revealed: (1) that packets of a white powder were found in the

victim's car, "suggesting the possibility of a drug deal gone

awry"; (2) that Baker missed work the day of the murder; and (3)

that a polygraph examination was administered to Ronald Baker, and

the examiner concluded that Baker may have had some knowledge of

the Jimmy Christian murder. Contrary to defendant's assertions,

trial counsel's affidavit shows that he was aware of the packets of

white powder found in the victim's car. In fact, trial counsel

cross-examined one of the investigating officers about the packets.

Defendant cites a police report in support of the assertion that

Ronald Baker was absent from work the day of the murder. Defendant

has not alleged that the prosecution suppressed this report, and

hence defendant has failed to show that defense counsel was unaware

of this information. Finally, as discussed earlier, the results of

Baker's polygraph would have been inadmissible at trial and

sentencing. Thus, even if defense counsel failed to discover the

polygraph results, as defendant asserts, no prejudice under

Strickland resulted.

     Defendant further claims that trial counsel's failure to

interview Martha Jackson and numerous other witnesses represents

ineffective assistance of counsel. While defendant broadly argues

that the failure to interview these witnesses impaired his ability

to effectively cross-examine them, the possibility that the result

of the trial was thereby affected is wholly speculative. A

defendant cannot rely on speculation or conjecture to justify his

claim of incompetent representation. People v. Holman, 164 Ill. 2d

356, 369 (1995). Accordingly, this argument is without merit.

     Defendant also contends that trial counsel's failure to

interview Nadine Christian's uncle, Tom Wolverton, constitutes

ineffective assistance of counsel. The record contains an anonymous

letter found in Jimmy Christian's wallet charging that Wolverton

was having an affair with Nadine. In addition, a police report

indicates that defendant and Martha Jackson had a conversation in

which they discussed "how Nadin's [sic] uncle Tom had been caught

in bed with her by the victim and thrown from the house by the

victim." Defendant contends that Wolverton thus had a motive to

kill Jimmy Christian.

     Counsel has only a duty to make reasonable investigations or

to make a reasonable decision which makes particular investigations

unnecessary, and the reasonableness of a decision to investigate is

assessed applying a heavy measure of deference to counsel's

judgment. People v. Orange, 168 Ill. 2d 138, 149 (1995). Where

circumstances known to counsel at the time of his investigation do

not reveal a sound basis for further inquiry in a particular area,

it is not ineffective for the attorney to forgo additional

investigation. Orange, 168 Ill. 2d at 150. Thus, counsel is not

necessarily required to investigate every individual with some

conceivable motive to kill the victim. It was entirely reasonable

for counsel to focus his strategy on the weaknesses in the State's

case rather than developing a speculative theory assigning blame

for the murder to Tom Wolverton. With regard to our assessment of

counsel's decision, we note that "[w]here circumstantial evidence

relied upon to support the defense that another committed the crime

is unsatisfactory, based upon mere surmise or possibility, without

evidence to support it, a hypothesis of innocence may be rejected

by the trier of fact." People v. Coleman, 168 Ill. 2d 509, 533

(1995).

     Moreover, both the anonymous letter and the information

related in the police report alleging a sexual relationship between

Nadine Christian and Tom Wolverton are inadmissible as hearsay.

Since defendant has failed to produce any admissible evidence that

Tom Wolverton had a motive to kill Jimmy Christian, there is no

basis to conclude that any investigation counsel might have

conducted would have produced any evidence useful to the defense.

Accordingly, defendant has not demonstrated that the failure to

interview Tom Wolverton, or otherwise investigate his possible

responsibility for the murder, was prejudicial under Strickland.

     Defendant also alludes to counsel's failure to investigate an

individual named Jack Louvier. Defendant contends that Louvier

moved to Texas with Nadine Christian shortly after the murder and,

accordingly, Louvier should be considered yet another possible

suspect in the murder of Jimmy Christian. Because defendant's post-

conviction petition as amended and supplemented contains no

allegations related to the failure to investigate Jack Louvier, the

issue is waived. In any event, the theory that Jack Louvier was

involved in the murder is entirely speculative. There is no

reasonable probability that a defense theory implicating Jack

Louvier as the killer would have succeeded.

                      C. Deficient Cross-Examination

     Defendant next argues that trial counsel's performance in

cross-examining Martha Jackson was deficient. As detailed earlier,

Jackson testified for the State that on one occasion she had

observed defendant and Nadine Christian kissing in a bar, and that

defendant had stated that if he could not have Nadine, no one

could. Jackson also testified that on one occasion she saw

defendant armed with a handgun carried in a shoulder holster at the

Christians' home. Defendant contends that his trial attorney should

have attacked Jackson's credibility with evidence of the

circumstances of her involvement in the murder investigation.

According to defendant, his attorney should have tried to discredit

Jackson with evidence suggesting that she assisted in the

investigation because she had been implicated in a separate plot to

murder her husband. Defendant also contends that trial counsel

failed to properly impeach Jackson with prior inconsistent

statements relating to her testimony that she observed defendant

with a handgun, and failed to object to certain irrelevant or

otherwise inadmissible testimony. Defendant essentially raised the

same issues on direct appeal. In his pro se brief on direct appeal,

defendant contended that trial counsel's failure to impeach Martha

Jackson based on her relationship with the authorities and

counsel's failure to object to prejudicial testimony constituted

ineffective assistance of counsel. This court rejected the argument

(see People v. Pecoraro, 144 Ill. 2d 1, 12-14 (1991)), and under

the principle of res judicata, that disposition is controlling

here.

     In any event, defendant's claim of deficient cross-examination

is meritless. Generally, the decision whether or not to cross-

examine or impeach a witness is a matter of trial strategy which

will not support a claim of ineffective assistance of counsel.

People v. Franklin, 167 Ill. 2d 1, 22 (1995). The manner in which

to cross-examine a particular witness involves the exercise of

professional judgment which is entitled to substantial deference

from a reviewing court. Defendant can only prevail on an

ineffectiveness claim by showing that counsel's approach to cross-

examination was objectively unreasonable. Similarly, as stated in

the opinion on defendant's direct appeal, trial strategy ordinarily

encompasses decisions such as what matters to object to and when to

object. Pecoraro, 144 Ill. 2d at 13.

     In the case at bar, trial counsel vigorously cross-examined

Martha Jackson. With regard to the episode where defendant and

Nadine had been kissing at a bar, counsel emphasized that the group

assembled at the bar had been drinking and defendant had several

drinks that night, thus suggesting that the events that transpired

were an isolated indiscretion.

     Counsel was also able to gain some advantage from Jackson's

testimony that she had seen defendant with a handgun. On cross-

examination, Jackson admitted that she described the weapon to

police as a .45-caliber handgun. This point is significant because

the State's evidence showed that defendant confessed to having

killed Jimmy Christian using a .45-caliber weapon, when ballistics

tests later revealed that a .357-caliber weapon had been used.

Thus, Jackson's testimony bolstered the theory that the police had

composed defendant's confession. Notwithstanding defendant's

argument that cross-examination might have been handled

differently, we cannot say that trial counsel's approach fell

outside the wide range of reasonable professional assistance. We

thus reaffirm the decision on this point in defendant's direct

appeal.

                 D. Failure to Introduce Expert Testimony

     Defendant claims that the assistant public defenders who

represented him at his suppression hearing erred by failing to

present expert testimony regarding the effect of drug and alcohol

use on his ability to knowingly and intelligently waive his Miranda

rights. Similarly, defendant contends that the privately retained

attorney who represented him at trial should have introduced expert

testimony showing that the use of drugs and alcohol rendered his

self-incriminating statements to police unreliable and unworthy of

belief. In support of this claim defendant submitted two affidavits

from Louis Hemmerich, Ph.D., a clinical psychologist. In his

initial affidavit, Dr. Hemmerich relied on the transcript of the

hearing on defendant's motion to suppress. At the suppression

hearing, Joseph Siemioneko testified that prior to defendant's

arrest defendant had consumed at least six beers and 1¼ grams of

cocaine. Defendant testified that he had used a substantial amount

of cocaine prior to joining Siemioneko. Based on Siemioneko's

testimony, Dr. Hemmerich formed the opinion defendant's blood-

alcohol content was well above the legal limit and that he was

intoxicated at the time of his arrest. Dr. Hemmerich also indicated

that the chief dangers of combining alcohol and cocaine were

cocaine psychosis and blackout. Cocaine psychosis is characterized

by poor reality testing, impaired judgment, inability to comprehend

and integrate information, paranoia and delusions. Cocaine

delusions involve confabulation: one makes up what is perceived to

be the truth. According to Dr. Hemmerich's affidavit, if defendant

had previously been a suspect in a murder case and was aware of

some of the facts of the case, cocaine psychosis might give rise to

the delusion that he had actually committed the crime even if he

had not.

     Dr. Hemmerich's affidavit also states that a person

experiencing blackouts often fabricates and does and says things

which he does not remember following the blackout. Dr. Hemmerich

offered the opinion that a person experiencing these conditions

would be unable to understand the significance of their Miranda

rights or appreciate the significance of waiving those rights, and

that during a blackout defendant may have assented to suggestions

presented in leading questions by police. Finally, Dr. Hemmerich

indicated that a person experiencing these conditions could appear

to be unimpaired to an observer who had not been specifically

trained to detect intoxication.

     Dr. Hemmerich submitted his second affidavit after

interviewing defendant. Based on the interview, Dr. Hemmerich

formed the opinion that: (1) defendant was most likely experiencing

a blackout as a result of excessive consumption of alcohol and

drugs; (2) in this condition defendant would not have been able to

understand the significance of his Miranda rights or their waiver;

and (3) defendant's blackout may have gone undetected by others.

     Defendant claims that had expert testimony of this nature been

presented to the trial court during the hearing on defendant's

motion to suppress, there is a reasonable probability the court

would have suppressed his statements to police. Defendant also

argues that had testimony been presented to the jury at trial,

there is a reasonable probability it would have found a reasonable

doubt as to defendant's guilt.

     We conclude that the failure to introduce expert testimony

during the suppression hearing was not prejudicial under

Strickland. Dr. Hemmerich's opinion regarding defendant's ability

to waive his Miranda rights was based, at least in part, on

defendant's own account of his drug and alcohol use prior to his

arrest. However, the trial court specifically rejected defendant's

account, deeming it "exaggerated and at times untruthful." Given

this rejection of the factual basis for the opinion regarding

defendant's waiver of his Miranda rights, it is doubtful that the

court would have found the ultimate opinion persuasive. In this

regard, we note that even if expert testimony had been presented,

the court would not have been required to accept the expert's

conclusions. People v. Mahaffey, 165 Ill. 2d 445, 463 (1995).

     We also conclude that defendant suffered no prejudice due to

the failure to introduce expert testimony at trial. We note that

Dr. Hemmerich merely suggested that it was possible that if

defendant was suffering cocaine psychosis and associated delusions

he might falsely confess to a crime merely because he had been

implicated in it. Dr. Hemmerich did not elaborate on how likely it

was that this would occur. Dr. Hemmerich also explained that if

experiencing a blackout during interrogation, defendant might have

assented to leading questions by police. Here, however, the record

shows that defendant flagged down a police officer at random and

gave a somewhat detailed account of the offense. That officer had

no prior knowledge of the offense and it is thus impossible that

this initial confession was the product of leading or prompting by

police. Under the circumstances, defendant has failed to show a

reasonable probability that expert testimony would have altered the

outcome of the suppression hearing or trial.

                      III. Post-Conviction Discovery

     During the post-conviction proceedings below, defendant moved

to take discovery depositions from various individuals. Defendant

contends that the denial of these motions was error. We note that

while defendant appears to take the position that the denial of

every one of his discovery requests was error, in his brief,

defendant only specifically addresses the denial of a few of his

requests. Specifically, defendant contends that he should have been

permitted to take depositions from Reverend Jerry Gibson, Detective

Raymond Schalk, Detective Bogucki and police officer Ralph Storck.

We limit our analysis to the denial of the discovery motions

relating to these individuals.

     In a post-conviction proceeding, the trial court has inherent

discretionary authority to order discovery. People v. Henderson,

171 Ill. 2d 124, 156 (1996); People ex rel. Daley v. Fitzgerald,

123 Ill. 2d 175, 183 (1988). In deciding whether to permit the

taking of a discovery deposition the circuit court should consider,

among other relevant circumstances, the issues presented in the

post-conviction petition, the scope of discovery sought, the length

of time between the conviction and the post-conviction proceeding

and the burden the deposition would impose on the opposing party

and on the witness. Fitzgerald, 123 Ill. 2d at 183-84.

     Defendant sought to depose Reverend Gibson with regard to

Ronald Baker's possible responsibility for the murder of Jimmy

Christian. In his motion and argument to the circuit court,

defendant failed to suggest how this information would be relevant

to a violation of defendant's constitutional rights. The denial of

defendant's motion to depose Reverend Gibson was not an abuse of

discretion.

     Defendant sought to depose Detectives Schalk and Bogucki to

learn whether the police had entered into any agreements with

Martha Jackson in exchange for her assistance in the investigating

defendant. We have already held that the disclosure of any such

agreement that may have existed would not have affected the outcome

of trial. Under these circumstances the denial of the motion to

depose these detectives was not error.

     Defendant apparently sought to depose Officer Storck in

connection with the theory that trial counsel was ineffective for

failing to investigate the possibility that a former police officer

named Jack Louvier may have been responsible for the murder. We

have already stated that this theory of the offense was too

speculative to support an ineffective-assistance-of-counsel claim.

We find nothing in the record to suggest that Officer Storck was

aware of any meaningful evidence implicating Jack Louvier in the

crime such as would have bolstered defendant's otherwise meritless

claim. Accordingly the circuit court did not err in denying the

motion to depose Officer Storck.

              IV. Denial of the Right to Self-Representation

     After trial, defendant filed a pro se motion for a new trial,

a pro se supplemental motion for a new trial or judgment

notwithstanding the verdict and a pro se motion in arrest of

judgment. Defendant also moved to be permitted to act as co-

counsel. Addressing defendant in open court, the trial court

stated, "My understanding of the law *** is that *** you have a

right to represent yourself or of course you have the right to be

represented by an attorney but you can't do both or you can't take

a position in between." However, the trial court allowed defendant

to submit his pro se motions and permitted defense counsel to argue

the motions.

     Defendant argues through counsel and in his pro se brief that

the trial court violated his absolute constitutional right to self-

representation under Faretta v. California, 422 U.S. 806, 45 L. Ed.

2d 562, 95 S. Ct. 2525 (1975). Faretta held that a criminal

defendant has a constitutional right to refuse state-provided

counsel and proceed without representation if he voluntarily and

intelligently elects to do so. See People v. Coleman, 168 Ill. 2d

509, 544 (1995). A trial court may appoint standby counsel to

assist the defendant. Faretta, 422 U.S. at 834 n.46, 45 L. Ed. 2d

at 581 n.46, 95 S. Ct. at 2541 n.46. However, Faretta does not

require the trial judge to permit " `hybrid' representation."

McKaskle v. Wiggins, 465 U.S. 168, 183, 79 L. Ed. 2d 122, 136, 104

S. Ct. 944, 953 (1984). See also United States v. Callwood, 66 F.3d

1110, 1114 (10th Cir. 1995); Cain v. Peters, 972 F.2d 748, 750 (7th

Cir. 1992). It has been stated that there is "a crucial difference

between a defendant seeking to represent himself and a defendant

asking to serve as `co-counsel' in his defense. The defendant has

no absolute right to the latter. Instead, `[t]he decision to grant

or deny "hybrid representation" lies solely within the discretion

of the trial court.' [Citation.]" United States v. Stevens, 83 F.3d

60, 67 (2d Cir. 1996). In view of these principles, the denial of

defendant's request to act as co-counsel was not a violation of

defendant's constitutional right of self-representation.

     Defendant further argues through counsel that the failure of

his appellate attorneys to raise this issue on direct appeal

constitutes ineffective assistance of counsel. Claims of

ineffective assistance of appellate counsel are evaluated under the

standard set forth in Strickland, 466 U.S. 668, 80 L. Ed. 2d 674,

104 S. Ct. 2052, which, as previously noted, requires the defendant

to show both deficient performance by counsel and resultant

prejudice. See People v. Coleman, 168 Ill. 2d 509, 523 (1995).

Since we have concluded that the issue of defendant's right to

self-representation is meritless, defendant suffered no prejudice

under Strickland as a result of appellate counsel's failure to

raise the issue. See Coleman, 168 Ill. 2d at 523.

                            V. Actual Innocence

     Finally, we note that defendant argues that he is actually

innocent of the murder of Jimmy Christian and is therefore entitled

to an evidentiary hearing on his post-conviction claims under the

principles of Schlup v. Delo, 513 U.S. ___, 130 L. Ed. 2d 808, 115

S. Ct. 851 (1995). Schlup essentially held that a petitioner in a

federal habeas corpus action is entitled to consideration of the

merits of otherwise procedurally barred constitutional claims if

the petitioner is able to show, based on newly discovered evidence

of innocence, that it is more likely than not that no reasonable

juror would have convicted the petitioner. Schlup, 513 U.S. at ___,

130 L. Ed. 2d at 836, 115 S. Ct. at 867; Schlup, 513 U.S. at ___,

130 L. Ed. 2d at 839-40, 115 S. Ct. at 869-70 (O'Connor, J.,

concurring). Assuming, without deciding, that Schlup should be

applied in state post-conviction proceedings, we note that we have

in fact considered the merits of the large majority of defendant's

post-conviction claims and Schlup would require no more with

respect to those claims. In any event, defendant has failed to

make the requisite showing under Schlup that based on newly

discovered evidence of innocence it is more likely than not that no

reasonable juror would have convicted defendant. Accordingly Schlup

does not apply.

     We further observe that this court has recently recognized the

viability of a "free-standing" post-conviction claim of "actual

innocence" based on new evidence of actual innocence. See People v.

Washington, 171 Ill. 2d 475 (1996). To be entitled to relief, the

supporting evidence must be new, material, noncumulative and of

such conclusive character as would probably change the result on

retrial. Washington, 171 Ill. 2d at 489. We note that defendant has

not attempted to assert such a free-standing claim, nor given the

record, could he do so successfully.

                                CONCLUSION

     For the foregoing reasons, the judgment of the circuit court

of Cook County dismissing defendant's post-conviction petition is

affirmed. The clerk of this court is directed to enter an order

setting Tuesday, May 13, 1997, as the date on which the sentence of

death, entered in the circuit court of Cook County, is to be

carried out. Defendant shall be executed in the manner provided by

law. 725 ILCS 5/119--5 (West 1994). The clerk of this court shall

send a certified copy of the mandate to the Director of

Corrections, to the warden of Stateville Correctional Center, and

to the warden of the institution where defendant is now confined.

 Affirmed.